## SHERMAN *v.* UNITED STATES.

No. 87.   Argued January 16, 1958.—Decided May 19, 1958.

*Henry A. Lowenberg* argued the cause and filed a brief for petitioner.

*James W. Knapp* argued the cause for the United States. On the brief were *Solicitor General Rankin, Warren Olney, III,* then Assistant Attorney General, *Beatrice Rosenberg* and *Robert G. Maysack.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The issue before us is whether petitioner's conviction should be set aside on the ground that as a matter of law the defense of entrapment was established. Petitioner was convicted under an indictment charging three sales of narcotics in violation of 21 U. S. C. § 174. A previous conviction had been reversed on account of improper instructions as to the issue of entrapment. 200 F. 2d 880. In the second trial, as in the first, petitioner's defense was

a claim of entrapment: an agent of the Federal Government induced him to take part in illegal transactions when otherwise he would not have done so.

In late August 1951, Kalchinian, a government informer, first met petitioner at a doctor's office where apparently both were being treated to be cured of narcotics addiction. Several accidental meetings followed, either at the doctor's office or at the pharmacy where both filled their prescriptions from the doctor. From mere greetings, conversation progressed to a discussion of mutual experiences and problems, including their attempts to overcome addiction to narcotics. Finally Kalchinian asked petitioner if he knew of a good source of narcotics. He asked petitioner to supply him with a source because he was not responding to treatment. From the first, petitioner tried to avoid the issue. Not until after a number of repetitions of the request, predicated on Kalchinian's presumed suffering, did petitioner finally acquiesce. Several times thereafter he obtained a quantity of narcotics which he shared with Kalchinian. Each time petitioner told Kalchinian that the total cost of narcotics he obtained was twenty-five dollars and that Kalchinian owed him fifteen dollars. The informer thus bore the cost of his share of the narcotics plus the taxi and other expenses necessary to obtain the drug. After several such sales Kalchinian informed agents of the Bureau of Narcotics that he had another seller for them. On three occasions during November 1951, government agents observed petitioner give narcotics to Kalchinian in return for money supplied by the Government.

At the trial the factual issue was whether the informer had convinced an otherwise unwilling person to commit a criminal act or whether petitioner was already predisposed to commit the act and exhibited only the natural hesitancy of one acquainted with the narcotics trade.

The issue of entrapment went to the jury,[1] and a conviction resulted. Petitioner was sentenced to imprisonment for ten years. The Court of Appeals for the Second Circuit affirmed. 240 F. 2d 949. We granted certiorari. 353 U. S. 935.

In *Sorrells* v. *United States,* 287 U. S. 435, this Court firmly recognized the defense of entrapment in the federal courts. The intervening years have in no way detracted from the principles underlying that decision. The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, "A different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." 287 U. S., at 442. Then stealth and strategy become as objectionable police methods as the coerced confession and the unlawful search. Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations.

However, the fact that government agents "merely afford opportunities or facilities for the commission of the offense does not" constitute entrapment. Entrapment occurs only when the criminal conduct was "the product of the *creative* activity" of law-enforcement officials. (Emphasis supplied.) See 287 U. S., at 441, 451. To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The prin-

---

[1] The charge to the jury was not in issue here.

ciples by which the courts are to make this determination were outlined in *Sorrells*. On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an "appropriate and searching inquiry into his own conduct and predisposition" as bearing on his claim of innocence. See 287 U. S., at 451.

We conclude from the evidence that entrapment was established as a matter of law. In so holding, we are not choosing between conflicting witnesses, nor judging credibility. Aside from recalling Kalchinian, who was the Government's witness, the defense called no witnesses. We reach our conclusion from the undisputed testimony of the prosecution's witnesses.

It is patently clear that petitioner was induced by Kalchinian. The informer himself testified that, believing petitioner to be undergoing a cure for narcotics addiction, he nonetheless sought to persuade petitioner to obtain for him a source of narcotics. In Kalchinian's own words we are told of the accidental, yet recurring, meetings, the ensuing conversations concerning mutual experiences in regard to narcotics addiction, and then of Kalchinian's resort to sympathy. One request was not enough, for Kalchinian tells us that additional ones were necessary to overcome, first, petitioner's refusal, then his evasiveness, and then his hesitancy in order to achieve capitulation. Kalchinian not only procured a source of narcotics but apparently also induced petitioner to return to the habit. Finally, assured of a catch, Kalchinian informed the authorities so that they could close the net. The Government cannot disown Kalchinian and insist it is not responsible for his actions. Although he was not being paid, Kalchinian was an active government informer who had but recently been the instigator of at least

two other prosecutions.[2]   Undoubtedly the impetus for such achievements was the fact that in 1951 Kalchinian was himself under criminal charges for illegally selling narcotics and had not yet been sentenced.[3]   It makes no difference that the sales for which petitioner was convicted occurred after a series of sales.   They were not independent acts subsequent to the inducement but part of a course of conduct which was the product of the inducement.   In his testimony the federal agent in charge of the case admitted that he never bothered to question Kalchinian about the way he had made contact with

---

[2] "Q. And it was your [Kalchinian's] job, was it not, while you were working with these agents to go out and try and induce somebody to sell you narcotics, isn't that true?

.            .            .            .            .

"A. No, it wasn't my job at all to do anything of the kind.

"Q. Do you remember this question [asked at the first trial]— . . . 'Q. And it was your job while working with these agents to go out and try and induce a person to sell narcotics to you, isn't that correct? A. I would say yes to that.'   Do you remember that?

"A. If that is what I said, let it stand just that way.

.            .            .            .            .

"Q. So when you testify now that it was not your job you are not telling the truth?

"A. I mean by job that nobody hired me for that.   That is what I inferred, otherwise I meant the same thing in my answer to your question."   R. 100.

[3] "Q. But you had made a promise, an agreement, though, to cooperate with the Federal Bureau of Narcotics before you received a suspended sentence from the court?

"A. [Kalchinian]. I had promised to cooperate in 1951.

"Q. And that was before your sentence?

"A. Yes, that was before my sentence."   R. 99.

Kalchinian received a suspended sentence in 1952 after a statement by the United States Attorney to the Judge that he had been cooperative with the Government.   R. 89, 98.

petitioner. The Government cannot make such use of an informer and then claim disassociation through ignorance.

The Government sought to overcome the defense of entrapment by claiming that petitioner evinced a "ready complaisance" to accede to Kalchinian's request. Aside from a record of past convictions, which we discuss in the following paragraph, the Government's case is unsupported. There is no evidence that petitioner himself was in the trade. When his apartment was searched after arrest, no narcotics were found. There is no significant evidence that petitioner even made a profit on any sale to Kalchinian.[4] The Government's characterization of petitioner's hesitancy to Kalchinian's request as the natural wariness of the criminal cannot fill the evidentiary void.[5]

The Government's additional evidence in the second trial to show that petitioner was ready and willing to sell narcotics should the opportunity present itself was petitioner's record of two past narcotics convictions. In 1942 petitioner was convicted of illegally selling narcotics; in 1946 he was convicted of illegally possessing them. However, a nine-year-old sales conviction and a five-year-old possession conviction are insufficient to prove petitioner had a readiness to sell narcotics at the time Kalchinian approached him, particularly when we must

---

[4] At one point Kalchinian did testify that he had previously received the same amount of narcotics at some unspecified lower price. He characterized this other price as "not quite" the price he paid petitioner. R. 80.

[5] It is of interest to note that on the first appeal in this case the Court of Appeals came to the same conclusion as we do as to the evidence discussed so far. See *United States* v. *Sherman*, 200 F. 2d 880, 883.

assume from the record he was trying to overcome the narcotics habit at the time.

The case at bar illustrates an evil which the defense of entrapment is designed to overcome. The government informer entices someone attempting to avoid narcotics not only into carrying out an illegal sale but also into returning to the habit of use. Selecting the proper time, the informer then tells the government agent. The set-up is accepted by the agent without even a question as to the manner in which the informer encountered the seller. Thus the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted.[6] Law enforcement does not require methods such as this.

It has been suggested that in overturning this conviction we should reassess the doctrine of entrapment according to principles announced in the separate opinion of Mr. Justice Roberts in *Sorrells* v. *United States,* 287 U. S. 435, 453. To do so would be to decide the case on grounds rejected by the majority in *Sorrells* and, so far as the record shows, not raised here or below by the parties before us. We do not ordinarily decide issues not presented by the parties and there is good reason not to vary that practice in this case.

At least two important issues of law enforcement and trial procedure would have to be decided without the benefit of argument by the parties, one party being the Government. Mr. Justice Roberts asserted that although the defendant could claim that the Government had induced him to commit the crime, the Government could not reply by showing that the defendant's criminal conduct was due to his own readiness and not to the persuasion of govern-

---

[6] Cf. *e. g., Lutfy* v. *United States,* 198 F. 2d 760; *Wall* v. *United States,* 65 F. 2d 993; *Butts* v. *United States,* 273 F. 35.

ment agents. The handicap thus placed on the prosecution is obvious.[7] Furthermore, it was the position of Mr. Justice Roberts that the factual issue of entrapment—now limited to the question of what the government agents did—should be decided by the judge, not the jury. Not only was this rejected by the Court in *Sorrells,* but where the issue has been presented to them, the Courts of Appeals have since *Sorrells* unanimously concluded that unless it can be decided as a matter of law, the issue of whether a defendant has been entrapped is for the jury as part of its function of determining the guilt or innocence of the accused.[8]

To dispose of this case on the ground suggested would entail both overruling a leading decision of this Court and brushing aside the possibility that we would be

---

[7] In the first appeal of this case Judge Learned Hand stated: "Indeed, it would seem probablé that, if there were no reply [to the claim of inducement], it would be impossible ever to secure convictions of any offences which consist of transactions that are carried on in secret." *United States* v. *Sherman,* 200 F. 2d 880, 882.

[8] For example, in the following cases the courts have, in affirming convictions, held that the issue of entrapment had been properly submitted to the jury. *United States* v. *Lindenfeld,* 142 F. 2d 829 (C. A. 2d Cir.); *United States* v. *Brandenburg,* 162 F. 2d 980 (C. A. 3d Cir.); *Demos* v. *United States,* 205 F. 2d 596 (C. A. 5th Cir.); *Nero* v. *United States,* 189 F. 2d 515 (C. A. 6th Cir.); *United States* v. *Cerone,* 150 F. 2d 382 (C. A. 7th Cir.); *Louie Hung* v. *United States,* 111 F. 2d 325 (C. A. 9th Cir.); *Ryles* v. *United States,* 183 F. 2d 944 (C. A. 10th Cir.); *Cratty* v. *United States,* 82 U. S. App. D. C. 236, 163 F. 2d 844. And in the following cases the courts have reversed convictions where the issue of entrapment was either not submitted to the jury or was submitted on improper instructions. *United States* v. *Sherman,* 200 F. 2d 880 (C. A. 2d Cir.); *United States* v. *Sawyer,* 210 F. 2d 169 (C. A. 3d Cir.); *Wall* v. *United States,* 65 F. 2d 993 (C. A. 5th Cir.); *Lutfy* v. *United States,* 198 F. 2d 760 (C. A. 9th Cir.); *Yep* v. *United States,* 83 F. 2d 41 (C. A. 10th Cir.).

creating more problems than we would supposedly be solving.

The judgment of the Court of Appeals is reversed and the case is remanded to the District Court with instructions to dismiss the indictment.

*Reversed and remanded.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE DOUGLAS, MR. JUSTICE HARLAN, and MR. JUSTICE BRENNAN join, concurring in the result.

Although agreeing with the Court that the undisputed facts show entrapment as a matter of law, I reach this result by a route different from the Court's.

The first case in which a federal court clearly recognized and sustained a claim of entrapment by government officers as a defense to an indictment was, apparently, *Woo Wai* v. *United States,* 223 F. 412. Yet the basis of this defense, affording guidance for its application in particular circumstances, is as much in doubt today as it was when the defense was first recognized over forty years ago, although entrapment has been the decisive issue in many prosecutions. The lower courts have continued gropingly to express the feeling of outrage at conduct of law enforcers that brought recognition of the defense in the first instance, but without the formulated basis in reason that it is the first duty of courts to construct for justifying and guiding emotion and instinct.

Today's opinion does not promote this judicial desideratum, and fails to give the doctrine of entrapment the solid foundation that the decisions of the lower courts and criticism of learned writers have clearly shown is needed.[1] Instead it accepts without re-examination the

---

[1] Excellent discussions of the problem can be found in Mikell, The Doctrine of Entrapment in the Federal Courts, 90 U. Pa. L. Rev. 245; Donnelly, Judicial Control of Informants, Spies, Stool Pigeons,

theory espoused in *Sorrells* v. *United States,* 287 U. S. 435, over strong protest by Mr. Justice Roberts, speaking for Brandeis and Stone, JJ., as well as himself. The fact that since the *Sorrells* case the lower courts have either ignored its theory and continued to rest decision on the narrow facts of each case, or have failed after penetrating effort to define a satisfactory generalization, see, *e. g., United States* v. *Becker,* 62 F. 2d 1007 (L. Hand, J.), is proof that the prevailing theory of the *Sorrells* case ought not to be deemed the last word. In a matter of this kind the Court should not rest on the first attempt at an explanation for what sound instinct counsels. It should not forego re-examination to achieve clarity of thought, because confused and inadequate analysis is too apt gradually to lead to a course of decisions that diverges from the true ends to be pursued.[2]

It is surely sheer fiction to suggest that a conviction cannot be had when a defendant has been entrapped by government officers or informers because "Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations." In these cases raising claims of entrapment, the only legislative intention that can with any show of reason be extracted from the statute is the intention to make criminal precisely the conduct in which the defendant has engaged. That conduct includes all the elements necessary to constitute criminality. Without compulsion and "know-

---

and Agent Provocateurs, 60 Yale L. J. 1091, 1098–1115; Note, Entrapment by Government Officials, 28 Col. L. Rev. 1067.

[2] It is of course not a rigid rule of this Court to restrict consideration of a case merely to arguments advanced by counsel. Presumably certiorari was not granted in this case simply to review the evidence under an accepted rule of law. The solution, when an issue of real importance to the administration of criminal justice has not been argued by counsel, is not to perpetuate a bad rule but to set the case down for reargument with a view to re-examining that rule.

ingly," where that is requisite, the defendant has violated the statutory command. If he is to be relieved from the usual punitive consequences, it is on no account because he is innocent of the offense described. In these circumstances, conduct is not less criminal because the result of temptation, whether the tempter is a private person or a government agent or informer.

The courts refuse to convict an entrapped defendant, not because his conduct falls outside the proscription of the statute, but because, even if his guilt be admitted, the methods employed on behalf of the Government to bring about conviction cannot be countenanced. As Mr. Justice Holmes said in *Olmstead* v. *United States,* 277 U. S. 438, 470 (dissenting), in another connection, "It is desirable that criminals should be detected, and to that end that all available evidence should be used. It also is desirable that the Government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained. . . . [F]or my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part." Insofar as they are used as instrumentalities in the administration of criminal justice, the federal courts have an obligation to set their face against enforcement of the law by lawless means or means that violate rationally vindicated standards of justice, and to refuse to sustain such methods by effectuating them. They do this in the exercise of a recognized jurisdiction to formulate and apply "proper standards for the enforcement of the federal criminal law in the federal courts," *McNabb* v. *United States,* 318 U. S. 332, 341, an obligation that goes beyond the conviction of the particular defendant before the court. Public confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law, is the transcending value at stake.

The formulation of these standards does not in any way conflict with the statute the defendant has violated, or involve the initiation of a judicial policy disregarding or qualifying that framed by Congress. A false choice is put when it is said that either the defendant's conduct does not fall within the statute or he must be convicted. The statute is wholly directed to defining and prohibiting the substantive offense concerned and expresses no purpose, either permissive or prohibitory, regarding the police conduct that will be tolerated in the detection of crime. A statute prohibiting the sale of narcotics is as silent on the question of entrapment as it is on the admissibility of illegally obtained evidence. It is enacted, however, on the basis of certain presuppositions concerning the established legal order and the role of the courts within that system in formulating standards for the administration of criminal justice when Congress itself has not specifically legislated to that end. Specific statutes are to be fitted into an antecedent legal system.

It might be thought that it is largely an academic question whether the court's finding a bar to conviction derives from the statute or from a supervisory jurisdiction over the administration of criminal justice; under either theory substantially the same considerations will determine whether the defense of entrapment is sustained. But to look to a statute for guidance in the application of a policy not remotely within the contemplation of Congress at the time of its enactment is to distort analysis. It is to run the risk, furthermore, that the court will shirk the responsibility that is necessarily in its keeping, if Congress is truly silent, to accommodate the dangers of overzealous law enforcement and civilized methods adequate to counter the ingenuity of modern criminals. The reasons that actually underlie the defense of entrapment can too easily be lost sight of in the pursuit of a wholly fictitious congressional intent.

The crucial question, not easy of answer, to which the court must direct itself is whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power. For answer it is wholly irrelevant to ask if the "intention" to commit the crime originated with the defendant or government officers, or if the criminal conduct was the product of "the creative activity" of law-enforcement officials. Yet in the present case the Court repeats and purports to apply these unrevealing tests. Of course in every case of this kind the intention that the particular crime be committed originates with the police, and without their inducement the crime would not have occurred. But it is perfectly clear from such decisions as the decoy letter cases in this Court, *e. g.*, *Grimm* v. *United States*, 156 U. S. 604, where the police in effect simply furnished the opportunity for the commission of the crime, that this is not enough to enable the defendant to escape conviction.

The intention referred to, therefore, must be a general intention or predisposition to commit, whenever the opportunity should arise, crimes of the kind solicited, and in proof of such a predisposition evidence has often been admitted to show the defendant's reputation, criminal activities, and prior disposition. The danger of prejudice in such a situation, particularly if the issue of entrapment must be submitted to the jury and disposed of by a general verdict of guilty or innocent, is evident. The defendant must either forego the claim of entrapment or run the substantial risk that, in spite of instructions, the jury will allow a criminal record or bad reputation to weigh in its determination of guilt of the specific offense of which he stands charged. Furthermore, a test that looks to the character and predisposition of the defendant rather than the conduct of the police loses sight of the underlying reason for the defense of entrapment. No

matter what the defendant's past record and present inclinations to criminality, or the depths to which he has sunk in the estimation of society, certain police conduct to ensnare him into further crime is not to be tolerated by an advanced society. And in the present case it is clear that the Court in fact reverses the conviction because of the conduct of the informer Kalchinian, and not because the Government has failed to draw a convincing picture of petitioner's past criminal conduct. Permissible police activity does not vary according to the particular defendant concerned; surely if two suspects have been solicited at the same time in the same manner, one should not go to jail simply because he has been convicted before and is said to have a criminal disposition. No more does it vary according to the suspicions, reasonable or unreasonable, of the police concerning the defendant's activities. Appeals to sympathy, friendship, the possibility of exorbitant gain, and so forth, can no more be tolerated when directed against a past offender than against an ordinary law-abiding citizen. A contrary view runs afoul of fundamental principles of equality under law, and would espouse the notion that when dealing with the criminal classes anything goes. The possibility that no matter what his past crimes and general disposition the defendant might not have committed the particular crime unless confronted with inordinate inducements, must not be ignored. Past crimes do not forever outlaw the criminal and open him to police practices, aimed at securing his repeated conviction, from which the ordinary citizen is protected. The whole ameliorative hopes of modern penology and prison administration strongly counsel against such a view.

This does not mean that the police may not act so as to detect those engaged in criminal conduct and ready and willing to commit further crimes should the occasion arise. Such indeed is their obligation. It does mean

that in holding out inducements they should act in such a manner as is likely to induce to the commission of crime only these persons and not others who would normally avoid crime and through self-struggle resist ordinary temptations. This test shifts attention from the record and predisposition of the particular defendant to the conduct of the police and the likelihood, objectively considered, that it would entrap only those ready and willing to commit crime. It is as objective a test as the subject matter permits, and will give guidance in regulating police conduct that is lacking when the reasonableness of police suspicions must be judged or the criminal disposition of the defendant retrospectively appraised. It draws directly on the fundamental intuition that led in the first instance to the outlawing of "entrapment" as a prosecutorial instrument. The power of government is abused and directed to an end for which it was not constituted when employed to promote rather than detect crime and to bring about the downfall of those who, left to themselves, might well have obeyed the law. Human nature is weak enough and sufficiently beset by temptations without government adding to them and generating crime.

What police conduct is to be condemned, because likely to induce those not otherwise ready and willing to commit crime, must be picked out from case to case as new situations arise involving different crimes and new methods of detection. The *Sorrells* case involved persistent solicitation in the face of obvious reluctance, and appeals to sentiments aroused by reminiscences of experiences as companions in arms in the World War. Particularly reprehensible in the present case was the use of repeated requests to overcome petitioner's hesitancy, coupled with appeals to sympathy based on mutual experiences with narcotics addiction. Evidence of the setting in which the inducement took place is of course highly relevant in

judging its likely effect, and the court should also consider the nature of the crime involved, its secrecy and difficulty of detection, and the manner in which the particular criminal business is usually carried on.

As Mr. Justice Roberts convincingly urged in the *Sorrells* case, such a judgment, aimed at blocking off areas of impermissible police conduct, is appropriate for the court and not the jury. "The protection of its own functions and the preservation of the purity of its own temple belongs only to the court. It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law. The violation of the principles of justice by the entrapment of the unwary into crime should be dealt with by the court no matter by whom or at what stage of the proceedings the facts are brought to its attention." 287 U. S., at 457 (separate opinion). Equally important is the consideration that a jury verdict, although it may settle the issue of entrapment in the particular case, cannot give significant guidance for official conduct for the future. Only the court, through the gradual evolution of explicit standards in accumulated precedents, can do this with the degree of certainty that the wise administration of criminal justice demands.