Lastly, Bradford asserts that the District Court erred in denying its post-trial motions for new trial and for judgment n. o. v., citing its argument already made with respect to the preceding questions. The welter of factual issues presented by this case were, by their very nature, of the sort peculiarly adapted to consideration by a trial jury. Under fair and appropriate instructions by the District Court they were submitted to a jury, whose verdict should have effectually put them to rest. This appeal, in its essence, really asks this Court to review, not the trial Judge, but the trial jury, which we are powerless to do. No prejudicial error has been demonstrated and the judgment of the District Court is

Affirmed.

**Marvin ROTH, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 16159.**

United States Court of Appeals
Eighth Circuit.

Oct. 8, 1959.

Bernard J. Mellman, St. Louis, Mo. (Morris A. Shenker, St. Louis, Mo., was with him on the brief), for appellant.

John A. Newton, Asst. U. S. Atty., St. Louis, Mo. (Harry Richards, U. S. Atty., St. Louis, Mo., was with him on the brief), for appellee.

Before GARDNER and VOGEL, Circuit Judges, and MICKELSON, District Judge.

GARDNER, Circuit Judge.

This case was commenced by the filing of an Information charging appellant Marvin Roth, a registered pharmacist, with the unlawful sale of drugs. The Information contained eight counts. Counts One and Two of the Information charged illegal sales of tincture opium camphorated, or paregoric, in violation of Section 4705(a), Title 26 U. S.C., while Counts Three to Eight, inclusive, of the Information charged illegal sales of dextro amphetamine sulphate tablets, in violation of Section 331 (k), Title 21 U.S.C.A. In the course of this opinion we shall refer to appellant as defendant. Defendant relied solely upon the defense of entrapment.

Counts One and Two charged the unlawful sale of paregoric, which contains a narcotic and hence such a sale constitutes a felony in violation of Section 4705(a), Title 26 U.S.C. The sales charged in Counts Three to Eight, inclusive, constituted misdemeanors violative of Section 331(k), Title 21 U.S.C.A. Defendant duly waived the right of jury trial and, with the consent of the United States Attorney and the court, the cause was tried to the court without a jury. The court was therefore performing the function of court and jury.

It is conceded by the defendant that he committed the offenses as charged in the Information, but contends that he was entrapped into so doing by agents of the Government, and that the evidence was of such a character that the Court should have sustained his motion for judgment of acquittal interposed at the

close of all the testimony, on the ground that the evidence proved entrapment as a matter of law. The court denied defendant's motion for judgment of acquittal and found him guilty on all counts. As the Government was the prevailing party, we must view the evidence in a light most favorable to the Government. We must assume that all conflicts in the evidence were resolved in favor of the prevailing party and it is entitled to the benefit of all such favorable inferences as may reasonably be drawn from the facts proven, and if, when so viewed, the evidence is such that different conclusions might reasonably be drawn therefrom, a question of fact, and not a question of law, was presented. We turn to an examination of the evidence, viewing it in a light most favorable to the Government.

As the transactions described in Counts Three to Seven, inclusive, occurred before those described in Counts One and Two, we shall consider them first.

The evidence produced at the trial by the Government was substantially as follows. In support of the charge contained in Count Three of the Information the evidence shows that on September 29, 1956, Mr. William Boyle, an inspector with the Food and Drug Administration, drove into a filling station operated by one Charles Gibson, in a truck tractor which had been rented for the purpose. He was dressed in work clothes and had the appearance of a truck driver. His purpose was to conduct an investigation as to whether drugs were being illegally sold at this location. If they were, he was to endeavor to obtain evidence for a conviction of the guilty parties. Mr. Boyle spoke to Mr. Gibson, saying that he wanted some aspirin to keep him awake. Mr. Gibson then called the defendant, Marvin Roth, at his home in University City. He used the number defendant had previously given where defendant said he could be reached if he ever had any call for "bennies." Gibson testified that he told defendant that a trucker was on the lot who wanted some "bennies". This term was subsequently explained as one which truck drivers and others use when referring to dextro amphetamine tablets. Defendant asked Gibson how many the trucker wanted, as it must be worth his while to come over. Gibson mentioned five hundred or a thousand tablets. Defendant said that he would come over, but that it would take a little while as he had some distance to travel.

Boyle waited on the filling station lot and defendant arrived in thirty to forty-five minutes. Defendant was then introduced to Boyle and he asked Boyle for some identification to show that he was a truck driver. Boyle refused to identify himself, but defendant observed that Boyle's left arm was sunburned, and said that Boyle must be a truck driver. Defendant held two bottles in his hands while this conversation was in progress. He then gave them to Boyle in exchange for fifty dollars. Boyle testified that each bottle contained a thousand dextro amphetamine tablets. Boyle testified that this was the substance of his entire conversation with defendant prior to the sale.

On Count Four the evidence shows that on October 10, 1956, Inspector Joseph Gebhart of the Food and Drug Administration obtained a prescription for fifty dextro amphetamine tablets from Dr. Bernard Flotte, a physician, in the name of Dick McCoy. McCoy was a fictitious name, which fact was known to the doctor issuing the prescription. Gebhart took the prescription to the Joseph Drug Store in St. Louis on the same date and had it filled. The charge was $2.50. The prescription called for the consumption of two pills per day by the patient and it was not to be refilled.

On December 29, 1956, Inspector Leo Cramer of the Food and Drug Administration went to the Joseph Drug Store and gave a piece of paper with the prescription number on it which had previously been given by Gebhart to the clerk and defendant refilled the prescription. He did not obtain permission from the doctor to do so. On cross-examination defendant admitted this and also that

he had no conversation with Cramer prior to the refill.

After receiving the tablets, Inspector Cramer asked defendant if he could sell him some metadaren tablets. Defendant said that he "should not" do so as it was a prescription item. Cramer did not press him further, merely saying that he would try to get a prescription.

In support of Counts Five and Six, the Government's evidence was to the effect that on January 8, 1957, Inspector Cramer again went to the drug store and asked to have the McCoy prescription filled. Defendant did so, again without attempting to contact the doctor who issued it. Defendant admitted this. After obtaining the tablets, Cramer asked defendant if they would be cheaper if purchased in amounts of one hundred. Defendant said that they would not be much cheaper. Cramer then said that his son-in-law, McCoy, traveled down through Rolla on a truck route and could get rid of a lot of them. Defendant said he should buy them in larger quantities. Cramer asked where they could be purchased, and defendant said that he could provide them. When Cramer asked how long it would take to get them, defendant said he had them outside in his car. Defendant then took Cramer to his car and sold him a bottle with a thousand dextro amphetamine tablets, for $30.00.

As to Count Seven, the Government proved that on the evening of January 10, 1957, Cramer called defendant on the telephone at the Joseph Drug Store. In this conversation Cramer arranged to buy a thousand dextro amphetamine tablets and a hundred metadaren tablets. They arranged to meet but did not do so until a later time.

On January 15, 1957, Cramer called defendant a second time at Joseph Drug. This time he asked if defendant knew about dextro amphetamine tablets that were slow in disintegrating in the system after being taken. Defendant said that Cramer meant spantules and that he had them in his car. He said that if Cramer would come right over to the store he could get them. Cramer ordered a hundred spantules and arranged to pick them up the next day.

During this telephone conversation, Inspector Cramer said that McCoy had asked about obtaining some "PG". This term was subsequently explained as meaning paregoric or tincture opium camphorated, a drug containing narcotics. Cramer continued the conversation by saying that he did not want to have anything to do with paregoric. That he did not want to take a chance. Defendant said, "I know what you mean." "You can get two to three" years for selling it. Cramer then said that he "was afraid of it; it was not worth the risk." Cramer said that he would bring McCoy down if defendant wanted to take a chance. Cramer said that McCoy had been paying $45 or $50 a gallon. Defendant then said that he could get it for less than $45. Defendant further said that paregoric was dynamite and that it meant the "Feds". He said that tablets were not so bad but he did not want to take a chance on "PG".

On January 16, 1957, Cramer met defendant outside of Nash's Drug Store, 1601 South Jefferson Avenue, St. Louis, Missouri, pursuant to prior agreement. Defendant then gave Cramer a bottle of spantules for which he received $9.00.

As has been observed, all these transactions resulting in sales violative of the law transpired before the sales described in Counts One and Two of the Information. In making these sales defendant was certainly not entrapped.

■ The Government agents did nothing to implant in his mind the disposition to commit these offenses in order to prosecute, nor did they incite, induce, instigate or lure the defendant to commit these offenses which he would not otherwise have committed, and it is well settled that the mere fact that officers of the Government afford an opportunity to commit the offense charged does not constitute entrapment. Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413; Sherman v. United

States, 356 U.S. 369, 78 S.Ct. 819, 2 L. Ed.2d 848; Masciale v. United States, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859; Butts v. United States, 8 Cir., 273 F. 35, 18 A.L.R. 143; Marbs v. United States, 8 Cir., 250 F.2d 514. In Sherman v. United States, supra, it is said:

"* * * the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment. Entrapment occurs only when the criminal conduct was 'the product of the creative activity' of law-enforcement officials. * * * To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." [356 U. S. 369, 78 S.Ct. 821.]

■ We shall now consider the evidence which it is claimed by the Government sustains the conviction of defendant on Counts One and Two. In considering this evidence it must be borne in mind that the defendant had confessedly already committed the offenses charged in Counts Three, Four, Five, Six and Seven of the Information, and these, we think, were similar offenses. He could not be characterized as an unwary innocent. In fact, in connection with the transaction described in Count Seven, defendant had a conversation with a Government agent with reference to a possible sale of paregoric which was the subject of sale described in Counts One and Two. In support of Count One the Government's witness Witt testified in substance that on January 21, 1957, he met the defendant in the 1600 block of South Jefferson at the rear of the Nash Drug Store, Inspector Cramer being also present. Cramer and he had been waiting there for defendant. When defendant drove up and parked his car Cramer and he got out of their car and walked to the rear of the drug store where they met defendant. Cramer and defendant had a conversation and then Cramer introduced Witt as Dick. Defendant turned to Witt and asked, "What do you want?"

The witness told him he wanted some paregoric. Defendant asked Witt what he would pay for it and he told him he was looking for the best deal that he could get. Defendant then told Witt that he knew he had been paying forty-five and fifty dollars a gallon and offered to sell it to him for forty dollars. Witt asked defendant if he would give a better price on a larger quantity. Defendant told Witt that he would sell him two gallons for seventy-five dollars and stated, "I will meet you at Eighteenth and Lafayette at ten minutes to five tomorrow," which was Tuesday. Defendant then walked on and entered the store, and Inspectors Cramer and Witt left the vicinity. Witt next met defendant the following evening at Eighteenth and Lafayette at 5:20 P.M. Defendant on seeing Witt said immediately, "Have you got anything with your name on it?" Witt told defendant, "I don't know anything about you, you don't know anything about me. Let's keep it that way." Defendant agreed that this was a good idea. Witt asked if he had his merchandise, and defendant said, "Yes, it is in the car." Defendant then directed that Witt drive his automobile from the corner and park it in the rear of defendant's automobile to transfer the packages. Witt did this and again met defendant on the sidewalk. Witt asked him where the PG was, and defendant stated that it was on the floor in the front of the car, meaning his car. Witt asked defendant if he wanted the money now and he said, "No, leave it on the front seat," so Witt opened the car door, and sat down on the front seat and counted out seventy-five dollars and as he started to pick up the packages he noticed that they were not labeled as paregoric. He asked defendant, "Is this paregoric? It is not labeled and I don't want to get the wrong stuff," and he pointed out the initial "P" which was printed on the gallon carton, and stated, "That stands for paregoric." Witt then took the two cartons and walked back to the Government car and placed them in the car and met defendant again, and defendant said, "You know,

we have got to be careful about this, the Government would be interested." Defendant then asked when Witt wanted an additional supply and was told either this week or next, and defendant asked how much he could handle and Witt said five or ten gallons. This testimony was corroborated by the witness Cramer.

In support of the Second Count the testimony of Government witnesses was to the effect that on January 25, 1957, defendant and Witt met in Forest Park as previously agreed and defendant sold five gallons of paregoric to Witt for one hundred seventy-five dollars.

The sale charged in Count One was consummated, as has heretofore been observed, after the sales charged in Counts Three, Four, Five, Six and Seven, all of which were violative of the law and made without any semblance of persuasion. The only words indicating that defendant was reluctant to sell paregoric were those mentioned in connection with sales described in Counts Four to Seven and it is worthy of note that it was the Government agent who first indicated a reluctance to be involved in a purchase of paregoric because of the penalties involved. The defendant at that time simply agreed with the suggestion made by the Government agent. He showed no reluctance, nor was there any persuasion involved when the actual transactions involving the sales described in Counts One and Two took place. True, the defendant testified to some protests but they apparently occurred during the transactions involved in Counts Four to Seven and the court manifestly credited the testimony of the Government witnesses. They gave their version of the transaction, the defendant gave his, and the court as the trier of the facts was the judge of the credibility of the witnesses and resolved all doubts in favor of the Government.

Defendant cites and relies upon a number of decisions holding that the trial court erred in holding as a matter of law that there had been no entrapment. These authorities in effect hold that the question of entrapment was one of fact to be determined by the jury, and not one of law. In the instant case the defendant is contending that the question of entrapment was one of law. We cannot agree. In principle the cases cited by defendant support the Government's contention in the instant case, to-wit; that the question of whether or not defendant was entrapped was, under the evidence in this case, a question of fact. The fact that the case was tried to the court without a jury cannot change the applicable rule. We conclude that the court was warranted in finding as a fact that there was no entrapment in this case.

The judgment is therefore affirmed.