Robert **COUCH, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

**No. 3–579A135.**

Court of Appeals of Indiana, Third District.

March 24, 1980.

R. Brent Zook, Goshen, for appellant.

Theo. L. Sendak, Atty. Gen., Wesley T. Wilson, Deputy Atty. Gen., Indianapolis, for appellee.

STATON, Judge.

Robert Couch was charged and convicted, by jury, of two counts of Theft,[1] a Class D felony. Couch was sentenced, on Count I, to the Indiana Department of Correction for 4 years. This sentence was suspended and Couch was placed on Work Release for a period of 60 days, followed by placement on Reporting Probation for a period of 4 years. The court instructed that a judgment of conviction of a Class A misdemeanor be entered on Count II and that Couch be incarcerated for one day. It then ordered the sentence suspended.

On appeal, Couch raises one issue for our consideration. Was sufficient evidence introduced at trial to overcome his defense of entrapment?

We affirm.

The facts relevant to our disposition of the case indicate that police officers "Dave" Maurer and "Jim" Whitfield were active in an undercover "Tac Unit," a police squad organized to procure stolen property and narcotics from suspected criminals "on the street." On July 19, 1978, "Dave" first met Couch "hanging out" in the neighborhood known as Hillbilly Heaven. For the next five weeks, "Dave" and "Jim" made an effort to gain the friendship and confidence of Couch and his friends. Hoping to create the impression that they dealt in stolen goods, they offered cigarettes and whiskey to this group at very low prices. "Dave"

---

1. IC 1971, 35-43-4-2. "Theft.—A person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a class D felony. . . ."

puffed some marijuana and "Jim" simulated smoking it in acting their parts of being "common street people" who "would do anything for money." To further enhance this image, "Dave" and "Jim" carried large amounts of money in rolled-up bundles which they displayed at appropriate times. Officer "Dave" Maurer testified as to his riding around the countryside, while drinking alcohol, with Couch and some of his friends. During these drives, "Dave" attempted to create, through conversational gambits, the impression that he was engaged in covert, illegal activities.

On September 4, 1978, Couch called "Dave" to ask him if he were interested in buying a Corvette which he had just stolen. "Dave" met Couch at a designated place and paid him $100 for the automobile. On September 12, 1978, Couch again called "Dave". This time he had four stolen vans and a pick-up truck for sale. "Dave" again met him and purchased the stolen vehicles for $1,400.00.

On appeal, Couch contends that it is impossible to conclude that he was predisposed to commit the crimes of theft due to the substantial police involvement in the undercover operation. He argues that he was entrapped by the police and that without the existence of this "sting" operation, he would not have committed the crimes. We disagree.

The defendant in *Whithan v. State* (1977), Ind.App., 362 N.E.2d 486, raised much the same issue as has Couch. In finding the defense of entrapment inapplicable there, the *Whithan* Court examined the two approaches to the use of the entrapment defense. One view is subjective in nature and focuses upon the conduct and propensities of the particular defendant in each case. Thus, if the defendant had the predisposition to commit the crime or if he had originated the criminal design, there has been no entrapment—regardless of the nature and extent of the government's participation. In the alternative view, the emphasis is upon whether the police conduct in the particular case is likely to have instigated or created the criminal offense. *Whi-*

*than, supra.* The *Whithan* Court notes that the subjective view has been expressly adopted by Indiana Courts. *Hardin v. State* (1976), 265 Ind. 635, 358 N.E.2d 134; *Whithan, supra.* This is not to say, however, that any type of police activity, in this circumstance, is permissible. In *Sherman v. United States* (1958), 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed. 848, the United States Supreme Court grappled with the limits of undercover police operations as they relate to the apprehension of criminals. It said:

"The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, 'A different question is presented when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.' [*Sorrells v. United States* (1932)], 287 U.S. [435] at page 442, 53 S.Ct. [210] at page 212 [, 77 L.Ed. 413]. Then stealth and strategy become as objectionable police methods as the coerced confession and the unlawful search. . . .

"However, the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment. Entrapment occurs only when the criminal conduct was 'the product of the *creative activity*' of law-enforcement officials (Emphasis supplied.) . . . To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. . . ."
356 U.S. at 372, 78 S.Ct. at 820–821.

The defense of entrapment exists when the defendant has been hired or induced by a government agency to commit a crime which he had no predisposition to commit. *Stewart v. State* (1979), Ind., 390 N.E.2d 1018. If the criminal thought origi-

nates with the defendant, there is no entrapment. *Hutcherson v. State* (1978), Ind., 380 N.E.2d 1219. Presentment of an opportunity by an undercover police agent to sell stolen goods does not constitute entrapment. *Williams v. State* (1978), Ind.App., 383 N.E.2d 444. The questions of whether the defendant was predisposed to commit a crime and whether he was entrapped are questions for the finder of fact. *Maynard v. State* (1977), Ind.App., 367 N.E.2d 5. When these questions are challenged on appeal as not being supported by sufficient evidence, this Court will neither resolve questions of credibility of the witnesses nor weigh the evidence. Instead, we will limit our review to that evidence most favorable to the State and all the reasonable inferences drawn therefrom. When there is substantial evidence of probative value to support the verdict, it will not be set aside. *Maynard, supra.*

 In the case at bar, the evidence reveals that the police officers did indeed purchase stolen merchandise from the Hillbilly Heaven group. They did not, however, make the first contact to buy nor did they encourage the commission of any thefts. As to Couch's theft of the Corvette, the testimony clearly shows that Couch stole the car, independent of any police suggestion to that effect.

"You are accused here with stealing a Corvette, 1965 Corvette?

"A. Yes, sir.

"Q. About September the 6th?

"A. Yes.

"Q. Would you tell us why you did that? Did you do it?

"A. Yes, sir, I did it for—

"Q. (Interrupting) How did you do it, how did you manage that?

"A. I was, I guess what you'd say, I was drinking, you know, and I overheard a conversation about two other guys that was going to do it for

$500.00 and they said the car was in good condition and stuff. And I had seen the car setting there a long time before Dave and them ever come around there. Nobody ever thought about messing with it. So, you know, I just took—

"Q. (Interrupting) Did you know what condition the car was in?

"A. Yeah, I knew it wasn't in no nice condition, it wasn't worth going stealing, really.

"Q. Did you ever represent to Dave that it was a good—a car in real good condition?

"A. I never did discuss the car with Dave till after I got it."

Couch's role in the theft of the vans and the pick-up truck was one of an accomplice;[2] he called "Dave" with news of the theft and acted as the negotiator for the sale of the vehicles. "Dave" knew nothing of the theft until after its commission. Couch admitted at trial that he tried to get in touch with "Dave" at least four times the previous night to tell him that:

"Q. Isn't it also true that you told them you wanted to get ahold of them earlier, had you been able to get ahold of them earlier, you could have sold as many as twenty more vans to them?

"A. No, sir, I did not.

"Q. You did not make that statement?

"A. I didn't say 'twenty.'

"Q. What did you say?

"A. It's just like, that Danny and Donny had told me they could have got more if I could have got ahold of Dave so he could have come and got 'em.

"Q. But you admitted to the officer that you could have had more vans had you been able to contact him earlier?

2. IC 1971, 35–41–2–4. "Aiding, inducing, or causing an offense.—A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense, even if the other person:

"(1) Has not been prosecuted for the offense;
"(2) Has not been convicted of the offense; or
"(3) Has been acquitted of the offense. . . ."

"A. I said they could have had more."

Couch argues that the police induced his commission of the thefts because of the five-week period of time in which they demonstrated the "rewards" attainable by a life of crime. He points to the various "confidence-winning" tactics used by the police as being inducements to commit the thefts. The testimony, however, shows, despite the police involvement in the undercover operation, that the "criminal thought" originated with Couch. The defense of entrapment is unavailable to him.

Accordingly, we affirm the judgment of the trial court.

GARRARD, P. J., and HOFFMAN, J., concur.

