## 75505. HATTAWAY v. THE STATE.
(365 SE2d 480)

McMURRAY, Presiding Judge.

Via indictment, defendant was accused of violating the Georgia

Controlled Substances Act by selling a quantity of marijuana to "GBI Agent M. A. Dull, for a consideration of $20.00." Defendant was convicted by a jury and subsequently sentenced to serve two years. Following the denial of his motion for new trial, defendant appealed, contending the trial court erred in refusing to submit a defense of entrapment to the jury. *Held*:

"In Georgia, the entrapment defense consists of three distinct elements: (1) the idea for the commission of the crime must originate with the state agent; (2) the crime must be induced by the agent's undue persuasion, incitement or deceit; and (3) the defendant must not be predisposed to commit the crime. OCGA § 16-3-25 (enacted in 1968). See *Schaffer v. State Board of Veterinary Medicine*, 143 Ga. App. 68, 71 (237 SE2d 510) (1977); Kurtz, Criminal Offenses in Georgia, p. 119 (1980). Under the majority view (which is followed in Georgia), the predisposition of the defendant toward crime is the key element of the defense. *Johnson v. State*, 147 Ga. App. 92, 93 (248 SE2d 168) (1978) (citing *Sherman v. United States*, 356 U. S. 369 (78 SC 819, 2 LE2d 848) (1958), and *Sorrells v. United States*, 287 U. S. 435 (53 SC 210, 77 LE 413) (1932))." *Keaton v. State*, 253 Ga. 70, 72 (316 SE2d 452). " 'Because the concept of entrapment involves the predisposition of the accused, the question, like all fact questions, is generally one for the jury to decide.' [Cit.]" *Tolbert v. State*, 138 Ga. App. 724, 726 (227 SE2d 416).

Defendant proffered evidence that he parted with the marijuana only because he was persuaded unduly to do so by one Harry Peaden. (Defendant knew Peaden in high school. Unbeknownst to defendant, Peaden was a Georgia Bureau of Investigation (GBI) informant.) In this regard, defendant testified as follows:

"I was pumping gas at the Nite Owl in my car and Harry walked up to me. And he asked me if I had any marijuana and I told him no. He asked me if I had any to sell and I told him no. And he wanted — he said, well you got a little bit, I know you got some. He said, come on me and my roommate's down from where we're going to school at. He said we've asked everybody in town and you're the only one I've seen that I thought might have some. He said we're fixing to go back to school and we need some. And I told him that all I had was just a small amount of my own and I didn't want to get rid of it, didn't want to sell none . . . He kept on telling me how bad they needed it and how they couldn't find any and I went on in to pay for the gas. Q. Did you have any further conversation with Mr. Peaden after that? A. Yes. He — when I got — he kept on after I got back and I got in my car. Q. When you say kept on, tell the Court exactly what he said. A. Just kept on saying how bad they wanted some marijuana they was going back to school and they really needed some to smoke cause they couldn't find none no where . . . Q. All right, sir. Was that the reason

that you agreed to make a sell? A. One of the reasons is to get them to quit bugging me. Q. To get them off your back. A. Yes. Q. And what was the arrangements that you made with Mr. Peaden or with Mr. Dull [GBI agent] about the sell [sic] of the marijuana? A. Well after I got back from paying the gas, I got in my car. And — Q. Did Mr. Peaden come back over there to the car and repeat his request of you? A. Yeah. He was standing there at the car and he kept saying, come on man you can sell me a little bit of it. He said, you ain't got to sell me all of it. Said, keep you some out to smoke and sell me a little bit. And I told him — I said, all right. I said, just give me — I'll just take me some out and you can have some. And he said all right I'll be back in a minute let me run over to the car and get the money. So that's when I pulled up and parked in front of the Nite Owl. And he went to a car . . . And when he came back, he had Mr. Dull with him.

"Q. And did you have any conversation with both of them then? A. When he come back, I asked him who he was and he said — said, this is my roommate, Mike Scott. He said, he's going to be the one buying it. Said, I ain't got no money. Said, he wanted to buy it, but he wanted to come over here and check the bag out before he bought it, so I brung him over here and just going to let him buy it from you. . . . Q. Was the — can you tell the Court why you made this sell [sic], was it because they asked you to do it? And that they told you that they were going take it to — back to school and use it there? A. Yeah. Q. And to keep them from bothering you about it? A. Yes, sir. Q. Was that the only reason you sold it to them? A. Yes, sir. Q. You made no approach to them, did you? A. No."

Evidence of defendant's predisposition to sell marijuana was limited to his possession of the drug at the time of the sale. "There was no evidence that the accused had been regularly engaged in the illegal sale of marijuana or that he had made any sale other than the one sale of less than an ounce, this to the [GBI] undercover agent." *Tolbert v. State*, 138 Ga. App. 724, 725, supra.

We think the evidence was sufficient to raise an entrapment defense (which was defendant's sole defense) for the jury's consideration although the evidence did not *demand* a finding that defendant was entrapped. *State v. Royal*, 247 Ga. 309 (1) (275 SE2d 646). The evidence raised questions which could not be resolved as a matter of law. *Tolbert v. State*, 138 Ga. App. 724, 725 (1), supra; *Johnson v. State*, 147 Ga. App. 92, supra. Compare *Garrett v. State*, 133 Ga. App. 564, 565 (3) (211 SE2d 584) (where defendant's testimony demonstrated "a marked disposition" to sell drugs) and *Mafnas v. State*, 149 Ga. App. 286, 290 (6) (254 SE2d 409) (where defendant admittedly sold drugs for 1-½ years).

*Judgment reversed. Sognier and Beasley, JJ., concur.*

DECIDED JANUARY 22, 1988.

*Howard P. Wallace*, for appellant.
*Johnnie L. Caldwell, Jr., District Attorney*, for appellee.