This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, Brian Gordon, appeals from the judgment of the Summit County Court of Common Pleas. We affirm.
On May 14, 2001, the Summit County Grand Jury indicted Mr. Gordon on three counts of trafficking in marijuana in the vicinity of a school, in violation of R.C. 2925.03(A)(1). Mr. Gordon pled not guilty to the charges and, on September 10 and 11, 2001, a jury trial was held. Mr. Gordon was found guilty on each of the three counts. This appeal followed.
Mr. Gordon asserts two assignments of error. We will discuss them together to facilitate review.
 First Assignment of Error "Whether the evidence presented was legally sufficient to sustain a jury verdict or alternatively was the verdict against the manifest weight of the evidence."
 Second Assignment of Error "Whether the Defendant presented sufficient evidence to demonstrate by a preponderance of the evidence the affirmative defense of entrapment."
First, we will consider Mr. Gordon's assertion that he demonstrated, by a preponderance of the evidence, the affirmative defense of entrapment and that the trier of fact acted against the manifest weight of the evidence in convicting him on three counts of trafficking in marijuana. Next, we will address the assertion that the evidence was insufficient to sustain his convictions. The assignments of error lack merit.
 Manifest Weight
When determining whether a conviction was against the manifest weight of the evidence, "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
In order for a criminal defendant to successfully assert the affirmative defense of entrapment, the defendant must show, by a preponderance of the evidence, that the criminal design originated with government officials and that such officials implanted the disposition to commit the alleged offense in the mind of an innocent person. State v.Doran (1983), 5 Ohio St.3d 187, 192-93. Entrapment has not occurred if a defendant was predisposed to commit the offense and government officials "`merely afforded opportunities or facilities for the commission of the offense[.]'" Id. at 192, quoting Sherman v. U.S. (1958), 356 U.S. 369,372, 2 L.Ed.2d 848.
"Evidence that is relevant to the predisposition of an individual to commit the crime should be freely admitted. Doran, 5 Ohio St.3d at 192. Relevant evidence on the issue of predisposition would include evidence which tends to establish:
 the accused's previous involvement in criminal activity of the nature charged, (2) the accused's ready acquiescence to the inducements offered by the police, (3) the accused's expert knowledge in the area of the criminal activity charged, (4) the accused's ready access to contraband, and (5) the accused's willingness to involve himself in criminal activity." Id.
Mr. Gordon was found guilty of three counts of trafficking in marijuana in the vicinity of a school, in violation of R.C. 2925.03(A)(1). R.C.2925.03(A)(1) provides that a person shall not knowingly "[s]ell or offer to sell a controlled substance[.]" R.C. 2901.22(B) defines the culpable mental state of knowingly and states, in pertinent part, that "a person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 3719.01(AA) provides that a "`[s]ale' includes delivery, barter, exchange, transfer, or gift, or offer thereof, and each transaction of those natures made by any person, whether as principal, proprietor, agent, servant, or employee." See State v. Ramirez (July 20, 2001), 6th Dist. Nos. WD-00-050 WD-00-062. R.C. 2925.01(P) provides that "[a]n offense is `committed in the vicinity of a school' if the offender commits the offense on school premises, in a school building, or within one thousand feet of the boundaries of any school premises."
Mr. Gordon has specifically not argued that there was not evidence presented to support each of the elements of his conviction but rather has argued that the finding was against the manifest weight of the evidence because the evidence indicates that the police targeted Mr. Gordon, entrapping him into acquiring marijuana for Deputy Sheriff Shawntell Kennedy. Mr. Gordon asserts that the evidence clearly indicates that he did not wish to sell marijuana to the deputy sherriff and that he was induced by the police into taking the deputy sheriff's money to purchase the drugs on her behalf.
In the present case, Detective Kenneth Mifflin from the City of Stow Police Department testified that the police had been informed about a possible rave party that was to occur on April 20, 2001 at the Blackwolf Billiards Hall ("the hall"), located 125 feet from school premises in Stow, Summit County. He further testified that he had been asked to provide surveillance from an unmarked police car with his partner on April 20th and that he had positioned the car in a parking lot before the hall opened so that he could observe the outside of the building. Detective Mifflin stated that he was not looking for a specific person but that he did have a list of four to five people, including Mr. Gordon, who frequently visited the hall.
Detective Mifflin explained that, at approximately four p.m., Mr. Gordon pulled into the parking lot at a fast pace, squealing his tires. He then testified that, only a couple of minutes later, Mr. Gordon sped over to a nearby payphone, made a call, and drove quickly back into the parking lot. Detective Mifflin stated that, within a few minutes of the phone call, a red Mustang pulled into the parking lot. At that point, Mr. Gordon approached the Mustang, leaned inside the window of the vehicle, and had a conversation with the driver; whereupon, the driver gave something to Mr. Gordon. Detective Mifflin also testified that he later observed Mr. Gordon give a clear plastic bag containing an unknown substance to another man who then gave Mr. Gordon money in return. The detective explained that these events transpired before Deputy Sheriff Kennedy arrived at the hall. The detective also stated that, shortly after this exchange, he observed Mr. Gordon and two other men standing outside the hall and that they appeared to light up a marijuana pipe, smoking the substance in the pipe.
Detective Mifflin testified that for the rest of the time that he provided surveillance, Mr. Gordon stayed mainly inside the hall but that, later in the evening, Mr. Gordon appeared outside, talking on a cell phone. After the phone call occurred, the same red Mustang appeared in the parking lot and another transaction occurred as the driver, again, gave Mr. Gordon something and Mr. Gordon gave the driver what appeared to be money. After this transaction, Mr. Gordon gave another man a clear plastic bag, receiving money in return. Later, the detective observed a second transaction between Mr. Gordon and this same man. On this occasion, Mr. Gordon gave the man small round objects that were smaller than the size of a dime in exchange for money.
Deputy Sheriff Kennedy testified that she is assigned to the Summit County Drug Unit and that, on April 20, 2001, her assignment was to purchase drugs undercover at a rave party that was to be held at the hall. She stated that she had been briefed on the assignment and was given information with regard to people on whom the police had gathered intelligence, including Mr. Gordon. She testified that Mr. Gordon was not the only person in whom the police were interested at the hall on April 20th. Deputy Sheriff Kennedy testified that approximately six people were at the hall when she arrived and that she communicated this fact to her surveillance team through the wire that she was equipped with that evening. She stated that she talked to several people, including Mr. Gordon, but that the atmosphere was awkward and that she believed that people thought that she was an undercover police officer.
Believing that her identity had been discovered, Deputy Sheriff Kennedy testified that she went out to her car in the parking lot where she met Mr. Gordon who was outside with two other men. She explained that she asked Mr. Gordon if he would like to ride in her car and that he accepted but immediately asked her if she was a police officer. Mr. Gordon then motioned the other two men toward her car where she was sitting in the driver's seat. According to Deputy Sheriff Kennedy, the two men handed Mr. Gordon a marijuana pipe which he took, indicating to her that he wished her to partake in the marijuana. After she told him that she was not interested, he told her that she was a police officer. Deputy Sheriff Kennedy testified that she then pretended to smoke the marijuana. Thereafter, she accompanied Mr. Gordon back into the hall, as Mr. Gordon told everyone that she was not a police officer.
Deputy Sheriff Kennedy testified that, for the rest of the evening, she socialized with the other people in the hall so that she could attempt to buy drugs from them. She stated that, as she socialized with people, she could overhear a conversation during which Mr. Gordon told another person "[m]y red mustang guy has not shown up yet and I've never had this problem before." Later, Mr. Gordon sat down next to Deputy Sheriff Kennedy and started to count out money. Upon seeing the money, she asked Mr. Gordon if he could get some drugs for her. According to the deputy sheriff, he replied by asking her for twenty-five dollars, going into the restroom for no more than two minutes, and handing her a plastic bag containing marijuana. Deputy Sheriff Kennedy testified that she left the hall at that point, telling everyone that she was meeting a friend. She then met with a detective at a predetermined location to turn over the plastic bag.
Deputy Sheriff Kennedy stated that she went back to the hall later that night for the express purpose of attempting to purchase contraband from other people. She testified that she had a discussion with two women who told her that they did not have anything to purchase. When she first arrived, the deputy sheriff testified that Mr. Gordon tried to encourage her to smoke marijuana again but that she refused his request. She then testified that she tried to go to the restroom but could not because several people were drinking beer in the room. When she asked Mr. Gordon for help, he cleared the people out of the restroom but stayed in the room himself so that he could have a discussion with another woman. In this discussion, according to Deputy Sheriff Kennedy, Mr. Gordon told the woman that she needed to give him more money and then proceeded to pull out another bag of marijuana similar to the one that he had previously provided to the deputy sheriff. Deputy Sheriff Kennedy testified that she asked him if she could buy a second bag and that he gave a bag to her for twenty-five dollars. She also testified that the other woman gave him money and that he placed some of the contents from another bag into the woman's hand. The deputy sheriff stated that, after leaving the restroom, Mr. Gordon asked her if she wanted more marijuana, and, when she replied in the affirmative, he sold her a third bag for twenty-five dollars.
On cross-examination, Deputy Sheriff Kennedy testified regarding the tapes that were recorded throughout that evening through her wire and explained that, when she had said "[y]our guy sold me marijuana," she had meant that one of the people that the police were investigating had sold her drugs. She also testified that Mr. Gordon did not ever tell her that he did not want to sell her marijuana, and, in fact, the only thing that he told her that he did not want to sell was the marijuana pipe.
Thomas Gottas, a police officer with the City of Stow, testified that he directed the investigation into drug activity at the hall. He stated that there were several people being investigated by the police and that one person whose name came up in an informational briefing was Mr. Gordon. He also stated that he had met Mr. Gordon one time previously when Mr. Gordon was arrested on trespass charges. Officer Gottas testified that, when Mr. Gordon was arrested, he had told the police that he was interested in providing drug information in exchange for leniency on his charge. Though he indicated that the drug discussion would have involved a person from Stow and the hall itself, Mr. Gordon made the decision not to work with the police when they would not agree to drop his charges entirely.
Beverly Gordon, Mr. Gordon's mother, testified that Mr. Gordon had a history with the Stow police department that extended back to his childhood. Ms. Gordon discussed the numerous charges, including incorrigibility, reckless operation of a vehicle, truancy, and either underage consumption or the sale of alcohol to a minor, brought against Mr. Gordon. However, she explained, that in each case, the charge was dismissed or Mr. Gordon was found not guilty. She also explained that her family had moved to a different city because the family felt that they were being harassed by the Stow police department. Ms. Gordon testified that she did not feel that her son was involved in any way with drugs.
Mr. Gordon testified that he met Deputy Sheriff Kennedy at the hall on April 20, 2001. He stated that they began to talk to each other and became friends throughout the evening. Mr. Gordon testified that she asked him to get her some marijuana. At first, he refused her request, telling her that he did not want any involvement with the police. He also testified that, on the tape that was recorded that night, he was not telling her that he would not sell her a marijuana pipe, but rather, that he would not sell her marijuana. Mr. Gordon admitted that he did get her drugs eventually, taking her money and going to someone named Josh who was known to have marijuana. He testified that he only got marijuana twice for her in this manner and that he did not get marijuana for her a third time.
Mr. Gordon testified that he does not sell marijuana. He conceded that he tried to work out a deal with the police when he was arrested for criminal trespass but that he could not come to an agreement with the police and that, in the end, he entered a guilty plea to the charge. When asked about Josh, Mr. Gordon stated that he drives a red Mustang. He testified that he did not see Josh earlier in the day before Deputy Sheriff Kennedy arrived because Josh had only been at the hall twice that day for a few minutes at a time. Mr. Gordon denied that Josh only came to the hall so that Mr. Gordon could buy drugs from him and stated that it was merely coincidental that Josh arrived in the hall each time that the deputy sheriff had requested marijuana. Mr. Gordon also denied going into the restroom with the deputy sheriff or that a drug transaction occurred between himself and another woman in the restroom.
After a careful review of the record, we cannot conclude that the trier of fact lost its way and created a manifest miscarriage of justice when it found Mr. Gordon had not established by a preponderance of the evidence the affirmative defense of entrapment and convicted Mr. Gordon of trafficking in marijuana, in violation of R.C. 2925.03(A)(1). The evidence in this case clearly indicates that Mr. Gordon was predisposed to sell the marijuana. Although Mr. Gordon presented conflicting testimony, we refuse to overturn the verdict because the trier of fact believed other witnesses. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the [trier of fact] believed the prosecution testimony."State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757. Accordingly, we hold that Mr. Gordon's convictions were not against the manifest weight of the evidence.
 Sufficiency
"Because sufficiency is required to take a case to the [trier of fact], a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462. Having already found that Mr. Gordon's convictions were not against the manifest weight of the evidence, we conclude that there was sufficient evidence to support the verdict in this case. Consequently, Mr. Gordon's assignments of error are without merit.
Mr. Gordon's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
SLABY, P.J., WHITMORE, J. CONCUR.