38102. JONES v. THE STATE.

Decided June 1, 1960—Rehearing denied June 21, 1960.

*William Hall, John L. Westmoreland, Grigsby H. Wotton,* for plaintiff in error.

*Paul Webb, Solicitor-General, A. Paul Cadenhead, E. L. Tiller,* contra.

Gardner, Presiding Judge. It is contended generally by the plea in abatement that because Mr. Cadenhead, an attorney of the Atlanta bar employed by the office of the Solicitor to help with the investigation and subsequent proceedings relating to dishonesty among public officials and related matters, appeared in the grand jury room at the time an indictment against this defendant and Brinson, a public official, for the offense of cheating and swindling was being considered, Cadenhead not being sworn and not being an authorized person to be present in the grand jury room at that time, the indictment was void and accordingly there could be no offense of embracery committed in connection with such void indictment. Cadenhead was not present in the grand jury room when the grand jury returned the indictment in this case.

The question is directed not to the legality of the indictment on which this defendant was tried in this case, but the legality of a former indictment as to which it is alleged that the defendant embraced certain jurors. As to perjury, it has been held that, so long as there is pending a proceeding over which the court has jurisdiction as to the subject matter, the fact that the alleged perjury was committed in a case which stated no cause of action and was subject to general demurrer did not keep it from being a judicial proceeding so as to be the foundation for the perjury charge. *Williford v. State,* 56 Ga. App. 40 (192 S. E. 93). As to the crime of embracery itself, it may be committed by approaching a prospective juror who has been neither sworn nor empaneled in the case, and who may never have anything to do with the case in which he is attempted to be influenced. *Martin v. State,* 43 Ga. App. 287 (158 S. E. 635). Code § 26-4702 makes embracery the crime of attempting "to influence a jury corruptly to one side." The jury is no less a jury because, as to one of the defendants, the indictment it returns is subject to be quashed. The grand jury is no less constituted as such, the indictment is no less returned, and the case is no less pending until disposed of, because there was an error in the proceedings which, if urged on the trial of the indictment, would preclude conviction under that indictment. Embracery as defined in our Code section may be perpetrated by attempting to influence a grand juror, although no indictment was returned, and even perhaps by influencing him on a matter before the grand jury which did not include the finding of a true bill. It cannot be said that this defendant is not charged with influencing "a jury" unless this grand jury was so constituted as not to be a legal grand jury, and the question is not whether it is a good indictment, but whether it is a legally constituted grand jury.

Special grounds 9 and 11 of the motion for a new trial are also without merit for the same reason.

■ On consideration of the demurrers it is noted that the indictment charged the defendant with the offense of embracery in that "Edward Westlake then and there being a grand juror and foreman of the grand jury sworn and serving at the March-

April term, 1959, of Fulton Superior Court, and said grand jury then and there having under consideration a special presentment against accused and J. W. Brinson, Jr., charging accused and said Brinson with the offense of cheating and swindling the State of Georgia, accused did wilfully and feloniously, by offer and promise of money to said grand juror and foreman; by attempting to procure the said grand juror and foreman to take money; and *by persuasions and entreaties, attempt corruptly to influence the said grand juror and foreman* to the side of the accused, and to use his power, authority, and influence as foreman and as a grand juror in favor of the accused." The general demurrer is based on the proposition that the Code section refers only to traverse juries, and the special demurrer here insisted on is addressed to the underlined language on the ground that it is ambiguous and indefinite.

It is generally accepted that the crime of embracery relates to attempts to influence grand jurors as well as traverse jurors. 18 Am. Jur. 617, § 7; U. S. v. Russell, 255 U. S. 138 (41 S. Ct. 260, 65 L. Ed. 553); 3 Wharton, Criminal Law (1957 Ed.) § 1282. The offense of embracery is of common-law origin, as is the institution of the grand jury, and, while there are no crimes in Georgia except those made so by statute, it is nevertheless permissible, where the language of the statute does not change the common-law intendment of the crime, to look to the meaning of the words employed as they existed in order to determine the definition of words employed by the statute. Accordingly, it is no ground of demurrer that the crime is alleged to have been perpetrated as to a grand juror.

It is ordinarily sufficient to describe the offense in the language of the Code. Code § 27-701. The words here objected to are in the language of Code § 26-4702. It is charged specifically that the crime was committed by offering money, and by attempting to procure the foreman of the grand jury to take money; accordingly, the addition of the words "and by persuasions and entreaties," which must be taken to refer to the attempt to procure a money transaction, is not so vague and ambiguous as to vitiate the indictment. The trial court did not err in overruling the demurrers to the indictment.

■ Under Code § 27-1201 a change of venue should be granted by the trial court "if from the evidence submitted the court shall be satisfied that an impartial jury cannot be obtained to try the case." Under Code § 38-1708, where the question under examination is one of opinion, any witness may swear to his opinion or belief, stating his reasons; if the issue shall be to the existence of a fact, opinions generally are inadmissible. On the hearing of evidence regarding the possibility of obtaining an impartial jury the fair-trial issue relates to a future thing; being an issue which only the future can determine absolutely, it is necessarily a matter of opinion at the time when the testimony is being heard. In *Broxton v. State,* 24 Ga. App. 31 (2) (99 S. E. 635) it was held: "Evidence that the defendant would receive a fair and impartial trial in the county wherein the alleged crime was committed was relevant, to throw light upon the state of the public mind." That opinion evidence is generally considered on this issue see *Douberly v. State,* 184 Ga. 573 (1) (192 S. E. 223); *Nickles v. State,* 89 Ga. App. 538 (1) (80 S. E. 2d 97). If it is relevant to show that the defendant may obtain a fair trial, it is also relevant when offered to show that he may not obtain a fair trial, when the facts upon which the opinion is based are stated. It was accordingly error for the trial court, in considering the 12 affidavits offered by the defendant for this purpose, to sustain an objection to that part of each which set forth that the witness, because of the facts stated, was of the opinion that the defendant could not obtain a fair trial because the prospective jurors "who have been summoned and will be impaneled to try him have been so exposed to the adverse, unfavorable and antagonistic newspaper articles, radio reports, television reports, and television moving pictures, and the general discussions caused thereby . . . that they would not yield readily to the testimony and evidence in the case." This is true even though the court would not be in any way bound by the opinions so expressed, but he should have considered them as relevant to the issue. However, since the court did take into consideration the facts on which such opinions were based, and since his decision was amply supported by the evidence, the judgment refusing to change the venue of the trial was not error.

Error is assigned on the overruling of the motion for a new trial consisting of the general grounds and sixteen special grounds.

The defense moved to continue the case on the ground that the defendant was first indicted for this offense under indictment 77427, and that he was forced to trial on a Tuesday under indictment 77502 which had been returned only on a previous Friday; that there was a variance between the two indictments and he was accordingly not ready to go to trial under indictment 77502 although he would have been ready and would have had, under the rules of court, to go to trial under indictment 77427. The judgment of the trial court overruling the motion for a continuance is excepted to both directly in the bill of exceptions and as a special ground of the motion for a new trial. The only changes made by the second indictment were (a) an allegation that the date of the offense was April 11, rather than March 11, 1959, and (b) that the special presentment then pending was "against accused and J. W. Brinson, Jr." rather than against the "accused." It was not shown that four days was an insufficient length of time to prepare a defense as against these two changes in an indictment as to which counsel stipulated they were otherwise ready for trial. The court did not abuse his discretion in overruling the motion. Code § 81-1419; *Harris v. State,* 119 Ga. 114 (45 S. E. 973).

An assignment of error on a judgment of the trial court refusing to change the venue is not a proper ground of a motion for a new trial. *Waters v. State,* 158 Ga. 510 (123 S. E. 806).

The general grounds and special grounds 6 and 12 of the amended motion for a new trial deal with the defense of entrapment and contend that the conviction was erroneous because the defense was sustained as a matter of law. The witness James Moore testified that he was a friend of the defendant; that he talked with the defendant on March 9, and learned that the defendant was being investigated by the grand jury; that he had read some of it in the newspaper before then; that J. W. Brinson was present and the witness asked him if he thought there was any chance he might be able to get out of the thing in any way and Brinson replied: "If we could find anybody we knew

on the grand jury we might be able to find some way." The defendant said Brinson had a copy of the grand jury list in his car. While Brinson was gone the defendant told Moore if there was any possible way he could get out of it he would like to do it no matter what the cost. Moore, after examining the list, said he thought he knew a friend of the foreman Westlake. The defendant said, "You had better call him up but I will have to tell you what to tell him. Tell your friend not to mention anyone's name. Ask him if he can soft pedal the whole situation that is before the grand jury." Moore then contacted Sanders and said: "I have this friend of mine in trouble and I was wondering if you thought it would be advisable to maybe feel Westlake out and see what he thought about it." He then testified: "He said he didn't believe that Westlake would accept anything, that he didn't know whether he would bring pressure but he wouldn't accept any money . . . When he said he wouldn't accept any money, I didn't tell Mr. Sanders about any money being involved. I did mention the name of my friend here." Sanders reported to Moore "that Mr. Westlake decided everybody before the grand jury was a bunch of criminals and that he was going to be a Sir Galahad and so forth and wasn't going to think about any legitimate businessman . . . but Mr. Westlake sounded like he might change his mind about putting everybody in jail and all." Moore testified: "In that initial meeting, there was nothing said about trying to give anybody any money or any presents or anything other than to see if he could get fair treatment before the grand jury . . . All my activities in this matter were acts of friendship in trying to help a friend . . . I had not told Mr. Sanders up to that time to offer Mr. Westlake any money or presents or anything other than to appeal to him only on a friendship basis."

Moore had a second conference with Sanders who "made the statement that he didn't see the need of talking to Mr. Westlake further, and at that time the whole thing was forgotten." Moore reported this conversation to Jones and any idea of influencing Westlake in their favor, whether innocently or corruptly, was then abandoned and Moore went to Nassau for a two-week vacation.

Edward Westlake testified that at the time he had the conversation with Sanders he was told by Sanders that Moore "represented a number of people who were greatly concerned by the way the State investigations were turning out, and that these people were afraid of their possible personal involvement in these cases. He said they were so desperate that they were willing to do anything to head off the State investigation or to get me to act favorably or vote favorably in their behalf. He said that figures anywhere from five thousand to a hundred thousand dollars had been mentioned . . . among these individuals being H. Candler Jones. I told him that some testimony had already come out in the grand jury about Mr. Jones." Westlake also made it clear to Sanders that he intended to do his duty as a grand jury foreman in accordance with his oath. He returned home and transcribed the conversation as he remembered it, but said nothing to anyone about it for almost a month. Eventually he decided to report the conversation to the Fulton County Solicitor-General. After considerable consultation, Westlake was advised to see if he could establish a direct contact with Moore to see "whether they wished to continue this bribery attempt." He called Moore several times but the latter was out of the city. He finally spoke to him the Tuesday after Moore's return to the city on Monday, identified himself, and said he would like to talk for about thirty minutes if possible. No one connected with the prosecution intended at any time to accept a bribe, their negotiations and discussions being solely to bring about the commission of the crime of embracery by the defendant. The meeting between Moore and Westlake was arranged as outlined above and after preliminary sparring for about an hour, which Westlake testified was "to see who would mention the business at hand first, and I outwaited him," Moore suggested that the State investigations were a mess. Westlake agreed. Moore said he was interested only in the defendant, and that he had told Jones that Dave Sanders was a mutual friend. Westlake said he was glad Sanders was out of it. Moore asked what it would take to help Mr. Jones in this matter. Westlake said his vote was not decisive, the man who could do some good would be Mr. Webb "who perhaps we

could get to work favorably for us," and Moore then asked: "What do you think it would take, one, two, three, four, five?" meaning thousands of dollars. Westlake said he "thought it would take a great deal more than that to take care of both Mr. Webb and me because after all our necks would be stuck way out"; for Moore to see what Mr. Jones was willing to do and then contact him again. Moore also swore: "Up to that time, Candler Jones knew nothing of anything that I was doing or that I was talking to anybody or was going to talk to anybody about it."

Westlake testified that he continued to encourage Moore; that he would reassure Moore whenever it appeared that the latter lost confidence in the deal going through; that he told Moore, and later Jones, that the plan was satisfactory with Mr. Webb, who was willing to go along because he and Mr. Cadenhead were at outs with each other. On cross-examination he stated that at Jones' request he asked Mr. Webb to call Mr. Jones' attorney; that the call was in regard to turning over some documents and not specifically to reassure Mr. Jones, but "I think also it probably would have reassured Mr. Jones." In his statement, the defendant said that the arrangement between himself and Westlake was that if Webb was in on the deal he was to call his attorney regarding the documents; that Mr. Webb called him directly and he was thereby led to believe that the solicitor was working with him. No further testimony was offered by the State as to this telephone conversation. As to Westlake's conversation with the defendant, he testified "[Jones] said that he wanted to be sure before he paid out any money that like any other good business man he would get what he was paying for. He said it wouldn't do him any good if these indictments were merely put off for another thirty days and went before the next grand jury, he wanted to be sure that these indictments or this indictment would not recur at the next grand jury, that it could be quashed completely. I said I thought it could. I said Mr. Webb will cooperate on that. And the reason I told him that Mr. Webb would cooperate on that was because of the previous conversation which I had with Mr. Moore that we would try to see if

Mr. Webb wouldn't cooperate in helping quash this indictment, and I said I didn't know specifically what Mr. Webb can do or will do." On cross-examination he testified as to the conversation of March 11: "As far as I was concerned and as far as the man who had the contact with me, Mr. Sanders, the matter was a closed book. And it stayed a closed book between me and Sanders, and has stayed a closed book between me and Sanders. And I stated when Mr. Moore and I first talked it was a game of cat and mouse between us as to which one would broach the subject first and I outwaited him . . . It is substantially correct that Mr. Moore said to me that I was foreman of the grand jury but that Mr. Webb is Solicitor and what about Mr. Webb in this situation and I said to Mr. Moore that I thought I could handle Mr. Webb and that he would join in it . . . I called at his office and said that the least we would take for this window contract was $10,000; I told him that is the least we would take. I didn't tell him anybody was 'we', but I think he understood. And whether he thought 'we' was me and Paul Webb, I don't know what he thought; I suppose he did. And I would say that is what I intended him to think by what I told him . . . I told Mr. Jones that Mr. Webb could take care of this pending indictment and I said I didn't know exactly how he could nor was I particularly interested in how he could but I knew he could. And Mr. Jones told me at that meeting at Hastings he was not interested in temporary relief, and I assured him that as far as the March-April grand jury was concerned that he would get relief there and told him that I thought Mr. Webb could handle it as a closed thing."

The incidents leading up to the deposit of the bribe money in a telephone booth by this defendant on April 11, 1959, pursuant to the arrangements made with Westlake, fall naturally into two divisions. First, the defendant and Moore procured Sanders to talk to Westlake; this talk resulted in a repudiation by Westlake so explicit that all parties thereto considered the incident at an end. Whatever Sanders may have inferred, and whatever he actually said to Westlake, the evidence is undisputed that he was cautioned by Jones not to use his name, and

he was not authorized by Jones or Moore to mention any sum of money. The act of sending Sanders to talk to Westlake was undoubtedly in the nature of a "feeler", but it was not embracery for the reason that no offer or attempt was made at that time, certainly none sanctioned by the defendant, to enter into any agreement, whether corrupt or not. Sanders did state on his own initiative that many people were involved of whom Jones was one, and that there was money to be made, but he made no offer under the State's version of the affair. The testimony of the defense does not of course go even this far, as they contend that the conversation as authorized by Jones was with a view to calling Westlake's attention to the fact that innocent business men whose names were unfairly bandied about in the investigation would receive undue injuries to their reputations. The "persuasions" mentioned in Code § 26-4702 are insufficient to make out the crime under this record as of March 11, 1959. Therefore, no crime had been committed as of that date and the defendants had abandoned any intent they might have had to commit this particular crime.

Secondly, it is undisputed that the first move which led to the commission of this crime was initiated at a conference in the office of the Solicitor-General on April 1, 1959, over three weeks later. Pursuant thereto, Westlake informed Moore that he wanted to talk with him. Since the men had never met, did not know each other, and had had no prior contact other than through the mediation of Sanders, it cannot be seriously disputed that this meant and was intended to mean to Moore that Westlake was interested in further discussion of the names then being investigated by the grand jury, including especially Candler Jones. Moore would not know whether the interest was in the interests of fair play; whether it was corrupt, motivated by the desire to take a bribe, or was a pretense of corruption made for the purpose of exposure. But there is no scintilla of doubt that both men understood the situation. They "sparred" for an hour, and Westlake described himself as outwaiting his opponent by which he meant outwitting him. His preliminary words were such as to convince Moore that his pur-

pose in arranging the meeting was to receive money. He eventually outlined the manner in which this could be done by inventing the procedure of "handling" the solicitor, without which, under the undisputed evidence, the crime would not have been committed, since Jones' interest was not to block this particular grand jury investigation so much as to assure himself that it would not be renewed at the next term. It is implicit in the testimony that Mr. Webb's complicity was to be signalized by a call from his office to the defendant's attorneys giving a stated message. There is no evidence that this call was made. However, the defendant stated that it was made directly to him and this statement stands undenied. Entrapment is generally recognized as a defense where the defendant is solicited or enticed into committing a crime which he would not otherwise have committed. *Osborne v. State*, 92 Ga. App. 518 (88 S. E. 2d 862). "Entrapment exists where the idea and intention of the commission of a crime originates with an officer of the State, and he, by undue persuasion, incitement, and deceitful means, induces the defendant to commit an act . . . which the defendant would not have committed except for the conduct of such officer." *Sutton v. State*, 59 Ga. App. 198 (3) (200 S. E. 225). It occurs when the criminal conduct is "the product of the creative activity" of law enforcement officials. Sherman v. U. S., 365 U. S. 369 (78 S. Ct. 819, 2 L. Ed. 2d 848). Where officers suspect a person of being systematically guilty of a certain type of offense, such as selling illegal liquor, the setting of a trap by proposing to such person that he sell to the decoy is not generally considered entrapment in the sense that it may be used as a legal defense for the reason that a part of the law-enforcement process involves the apprehension and removal of known criminals. A different situation is presented where a man is persuaded into committing a crime in the first instance. As was stated in Butts v. U. S., 273 F. 35, 38: "The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it. . . It is unconscionable, contrary to public policy and to the established law of the land to punish a man for the commission

of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded and lured him to attempt to commit it." We do not insist in this case that the record shows the defendant never thought of committing the crime until the idea was placed in his mind by the foreman of the grand jury, nor is such a conclusion necessary. Granted that Jones displayed a willingness to corrupt; granted that if Westlake had not refused to proceed at the first meeting between him and Sanders these initial negotiations might well have led to the same conclusion and he would, under those facts, have been properly convicted; yet, the fact remains that this was not the case, and any criminal enterprise lodged in the defendant's thoughts was abandoned before it had an opportunity to come to fruition.

The carefully laid plans of the prosecution to bring about the commission of this crime are indicative of its lack of faith in the strength of its original case against this defendant, the suppression of which this crime was committed to accomplish. The presence of the representatives of the media for the dispensation of news on the scene of the place selected by the prosecution for the commission of the crime tends to discredit the motives of the prosecution as being for the prevention of crime and to bring about punishment for its commission. On the contrary, a desire to stage a sensational crime for publicity purposes is reflected.

That this was a trap set by the highest law-enforcement officers of the State of Georgia in Fulton County cannot be denied. The State's contention is that it by-passes the defense of entrapment because the scheme originated in the mind of the defendant and not with them. However, a careful analysis of this evidence is insufficient to support the State's theory in this respect. Pursuant to a well laid plan they renewed negotiations with Moore, whom they knew to be active on behalf of the defendant. In the original negotiations the defendant had neither made, proposed, nor authorized any corrupt offer. The first offer to corruption of which the defendant had knowledge came from the prosecution. Every objection and obstacle which the

defendant foresaw was met and solved by the prosecution. The media in this locality for the dispensation of news were kept informed of every progressive step that the prosecution was able to make toward the ultimate springing of the trap. Their knowledge of the time and place of the ultimate incident was such as to indicate that the whole drama was staged primarily for their benefit. They were able to take up strategic positions where they could make motion pictures of the crime while it was in the process of being committed, as well as in its earlier stages. In this case the prosecution went further and participated more in bringing about the commission of the crime by the defendant than in any case we have been able to find anywhere in the United States where the defense of entrapment was not upheld. This court is of the opinion that the conduct of the prosecution in this case falls far short of the high standard that must be set by law-enforcement officers in the administration of justice on behalf of the sovereign State of Georgia, and we cannot approve it.

The defense of entrapment being complete, and the evidence not otherwise authorizing conviction, the trial court erred in denying the motion for new trial.

The remaining grounds of the amended motion for a new trial are either controlled by what has been held in the foregoing division of this opinion, or they are otherwise without merit.

*Judgment reversed. Townsend and Carlisle, JJ., concur.*