Samuel Jacento ORTEGA, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 19687.

United States Court of Appeals
Ninth Circuit.

June 29, 1965.

David C. Marcus, Los Angeles, Cal., for appellant.

Manuel L. Real, U. S. Atty., John K. Van de Kamp, Asst. U. S. Atty., Chief, Crim. Sec., J. Brin Schulman, Asst. U. S. Atty., Asst. Chief, Crim. Sec., Jules D. Barnett, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS, BARNES and ELY, Circuit Judges.

BARNES, Circuit Judge.

Appellant Ortega was indicted by a federal grand jury on May 27, 1964 in four counts for violation of Title 21, United States Code, Section 174. The indict-ment charged appellant with the conceal-ment and sale of 1.140 grams of heroin on April 24, 1964 (Counts 1 and 2) and of 8.800 grams of heroin in a separate trans-action on the same day, April 24, 1964 (Counts 3 and 4).

Following trial by jury, a verdict of guilty was returned against appellant as to all counts. The appellant was sen-tenced to the custody of the Attorney General for a period of five years on each count, the sentences to run concurrently. A timely notice of appeal was filed. Ap-pellant requested permission to appeal *in forma pauperis,* and was granted his re-quest by the district court.

The jurisdiction of the district court rested on Title 18, United States Code, Section 3231 and Title 21, United States Code, Section 174. This court has juris-diction under Title 28, United States Code, Sections 1291 and 1294.

We accept appellee's general statement of the facts.[1]

The single issue raised on this appeal is whether defendant was entitled to an instruction on entrapment.

"Entrapment" is a word of art having a precise definition in the law. This defi-nition attempts to delineate what entrap-

---

1. "On April 24, 1964, at approximately 4:15 p.m., in Los Angeles, under the surveillance of federal agents, appellant sold and delivered ten No. 5 capsules, con-taining a brownish powder, to an under-cover assistant of the Federal Bureau of Narcotics. Appellant received $20 in re-turn for this amount of heroin. The un-dercover assistant then delivered the capsules to an agent of the Federal Bureau of Narcotics. This powder was subsequently identified as being 1.14 grams of heroin. Prior to this sale the undercover assistant had been searched by an agent of the Federal Bureau of Narcotics and was found to have no per-sonal property of any sort in his posses-sion other than approximately $1.50.

"On the same date, in Los Angeles, at approximately 5:40 p.m., after lengthy conversation with Federal Narcotics Agent Celaya, appellant, in return for $130, sold 8.800 grams of heroin to Agent Celaya.

   *     *     *     *     *

"After the Government witnesses had testified to the aforementioned facts, one Roger Strickland, the undercover assist-ant mentioned in Count 2 of the indict-ment, was called as a witness for ap-pellant, and testified that appellant had not actually sold the heroin to him (Strickland) but had merely pretended to do so so that Strickland could safely sell the narcotics to the agent of the Federal Bureau of Narcotics. Strickland so tes-tified despite the statement he had signed on May 18, 1964 which detailed appellant's actual involvement in the crime.

"Appellant Ortega then testified that he did not commit the crime charged but rather only acted out a charade as a *favor* to Strickland, a position maintained by appellant Ortega at the time of sen-tencing. Appellant at the close of the en-tire case requested that the trial court instruct the jury on the question of en-trapment, which request was denied." (Appellee's Brief, pp. 3–4.)

ment is as well as what it ordinarily is not. It is:

"the act of a government officer or agent *inducing a person to commit a crime not contemplated by him*, for the purpose of instituting a criminal prosecution against him. But the mere act of an officer in furnishing the accused an opportunity to commit the crime when the criminal intent was already present in the accused's mind is not ordinarily entrapment." (Emphasis added.) Black's Law Dictionary, 4th ed., p. 627.

▇ As we said in Ramirez v. United States, 9 Cir., 294 F.2d 277, 283 (1961): "[A]bsent the commission of a crime, there can be no entrapment." And see: Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249 (1932); Sylvia v. United States, 312 F.2d 145 (1st Cir. 1963); Matthews v. United States, 290 F.2d 198 (9th Cir. 1961); Ware v. United States, 259 F.2d 442, 445 (8th Cir. 1958); Rodriguez v. United States, 227 F.2d 912, 914 (5th Cir. 1905); Hamilton v. United States, 221 F.2d 611 (5th Cir. 1955); Eastman v. United States, 212 F.2d 320, 322 (9th Cir. 1954); Bakotich v. United States, 4 F.2d 386 (9th Cir. 1925).

▇ Thus, to utilize the entrapment defense, an accused must admit he committed acts which constitute a crime, but assert that those acts he committed were not contemplated by him until he was improperly induced to commit them by a government agent.

▇ Here the defendant denied the commission of the crime, i. e., denied he sold, or had possession of, or delivered, any narcotics. (R.T. 237–38.) His counsel asserted: "The defense * * * is this: That Mr. Ortega never sold this officer any narcotics." (R.T. 114.) Defendant testified he made no sale; the government witnesses testified they saw the sale. This created an issue for the jury's determination.

Appellant relies heavily on Hansford v. United States, 112 U.S.App.D.C. 359, 303 F.2d 219 (1962). There the jury was instructed on entrapment and the defendant objected. Without the citation of any authority, and considering it (in their words) "a minor matter", the court *en banc* held that where the defendant had denied the sale of narcotic drugs, the *giving* of an instruction on entrapment was proper, because the two-fold defense was not inconsistent. "It was consistent with defendant's denial of the transaction to urge that if the jury believed it did occur the government's evidence as to how it occurred indicated entrapment." Hansford v. United States, supra at 221.

▇ We do not agree. Perhaps this is a matter of semantics, but we believe the defense of entrapment (i. e., "I only did it because the government agent induced me to do it") *is* inconsistent with the defense "I didn't do it." But semantics aside, we do agree that giving of the instruction was not error. "It cannot be prejudicial to permit him [appellant] an extra defense." Sylvia v. United States, supra, 312 F.2d at 147.

The real issue in Hansford, supra (or "the more serious matter," as that court stated), was whether the court had so instructed the jury on the defense of entrapment as to make the defense available only to an "innocent" man, "that is, a man who has no criminal record, and was enticed." Hansford not only had a criminal record; he was asked about it on cross-examination, including questions as to three previous convictions of petty larceny and one violation of the Harrison Narcotic Act.

The District of Columbia court of appeals held that the failure of the trial court to properly define "an innocent man" was error. The court meant, in referring to "an innocent man," one "who would not have sold narcotics but for the enticement." Hansford, supra, 303 F.2d at 222. But the jury under the instruction given "could well believe that the defense of entrapment was available only to an innocent man, that is, a man who has no criminal record, and was not enticed."

Concededly, that is not the law. Sherman v. United States, supra.

"It [entrapment] involves the conduct of law-enforcement officers in leading another to commit an act defined as a criminal offense." Hansford v. United States, supra, 303 F.2d at 222.

"[I]n such cases two questions of fact arise: (1) did the agent induce the accused to commit the offence charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence. On the first question the accused has the burden; on the second the prosecution has it." United States v. Sherman, 200 F.2d 880, 882–883 (2d Cir. 1952).

"However, the fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment. Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials. [emphasis by the Supreme Court] * * * To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. * * * [A]t trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence." Sherman v. United States, 356 U.S. 369, 372–373, 78 S.Ct. 819.

We must then search the evidence to determine what was the "creative activity" of the government.

Here the stool pigeon, Strickland, testified (contrary to a written statement given to the government at an earlier time) that he had merely "played a charade," inducing appellant to pretend to sell Strickland narcotics, and thereby afforded Strickland the opportunity to sell *his* (Strickland's) narcotics to the government agent.

The appellant related no repeated urging on the part of Strickland nor any conduct or series of events that could have broken down Ortega's resistance—just that Strickland said, in Ortega's ambiguous words: "He says, 'You know what?' he says. He says, 'I have got a gram.' He wants to score a gram,' he says. He says, '*Act like you're going,* you know, *to give him—like I'm giving you the gram, and just take the money.'* So I says 'All right,' so like he does it, you know." (Tr. 234)

It is unnecessary for us to pass judgment on the truth or falsity of Strickland's and Ortega's testimony. The jury has already done that. Strickland, at best, had a very bad memory.[2]

---

2. At the trial, when he sought to aid Ortega by denying Ortega had sold the heroin to the government agent Celaya, Strickland could not remember from whom *he had* bought the narcotics. (R.T. 166) Strickland testified he purchased a half an ounce of heroin for $175 (R.T. 166); and then stated he only put up $15.00. (R.T. 169) After meeting Celaya, Strickland said he was not searched by anyone. (R.T. 143–44; 193–94) Celaya said he searched Strickland (R.T. 52).

When the second purchase was made from Ortega, the government agent declined to pay for the heroin before he saw it. Ortega then came over to the agent's car. The testimony of Strickland reads:

"I went back to the car and told him [Celaya] that the guy—that Sammy [Ortega] wouldn't 'burn' him or nothing; give him the money and he would be back with the stuff.

"Q. Sammy wouldn't what?

"A. 'Burn' him, you know, take the money and not come back.

"THE COURT: You told Celaya that?

"THE WITNESS: Yes, I told him that.

"THE COURT: All right.

"THE WITNESS: Sammy could be trusted, in other words.

"THE COURT: You told Celaya Sammy could be trusted?

"THE WITNESS: Yes.

"THE COURT: So what happened?

Admittedly, and without dispute, defendant Ortega accepted $20 and $130 from Strickland and Celaya, knowing the money was puchase money for narcotics which he knew Strickland possessed and physically had in his possession in Ortega's auto which Strickland was to deliver to government agent Celaya as a narcotic sale. (Tr. 242) He aided in and induced the transfer of narcotics for money. We cannot say as a matter of law that Ortega's admitted actions did not "facilitate" the concealment and transportation of narcotics; or that it did not "facilitate" the sale thereof to Celaya. Nor could we say it was not for the jury to decide whether, although the narcotics were on Strickland when he sat in Ortega's auto, and Ortega handed Strickland the purchase money (as was testified), Ortega did *not* have a constructive possession of the narcotics Strickland admittedly had in his physical possession.

This, then, is not a case where any government agent asked Strickland to perform the alleged treacherous "charade". Neither Celaya nor any other government agent had the slightest knowledge that Strickland proposed to "frame" Ortega, if in fact he did.

In this connection we feel constrained to consider a recent case from the District of Columbia Circuit. In Smith v. United States, 118 U.S.App.D.C. 38, 331 F.2d 784 (1964), a majority of that court held the trial judge erred in refusing to instruct on entrapment. "To be sure," the court said, "the defense had not here alleged resort by the officers to the usual Government stratagem of sending some prospective purchaser to buy narcotics from a known or suspected seller," which the court reaffirms is a lawful act:

"[note] 16. 'It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises.'" Smith v. United States, supra at 789–790, quoting Sorrells v. United States, 287 U.S. 435, 441, 53 S.Ct. 210.

"THE WITNESS: So then Sammy came over and was talking to him and told him the same thing, and Celaya didn't want to leave go of his money; he wanted to see the stuff right then and there.

Sammy told him he would have to go and get it, that he couldn't just do that. He said he couldn't get the stuff without the money and he can't take him to the connection.

"BY MR. MARCUS: Q. Did you tell Sammy to take the money?

"A. What? Yes. I told him to take the money and go somewheres for a little while and then come back. See, when I talked to him previously I told him that—I told him, 'When he gives you the money, just go like you're going to score somewhere, and then come back.'

"THE COURT: Then what happened after you gave him the money? After Mr. Celaya gave the defendant Ortega the money, then what happened?

"THE WITNESS: Then Sammy left, and I told him I would be waiting for him in front of the Market Basket.

"THE COURT: All right.

"THE WITNESS: So he left, and about 20 minutes later I went out in front of the Market Basket, waited for him to come back.

He showed up about 10 minutes later and I got in the car. He gave me the money. I put it in my shoe and took out the stuff and went back to Celaya, told him I had gotten it.

"THE COURT: You say you got into Ortega's car?

"THE WITNESS: Yes.

"BY MR. MARCUS: Q. Where did you go?

"A. Nowheres. The car stopped right there. I just go in for—I was there maybe 30 seconds, something like that. It didn't take long. I just pulled it out. He gave me the money and I just put it in my shoe.

"THE COURT: Put what in your shoe?

"THE WITNESS: The money."
(Tr. 183–84)

The Smith case was not a case of entrapment, but of "frame-up," i. e., had the narcotics been "planted" on Smith. Smith had perhaps been "set up" by one Paris on previous narcotic convictions. On October 23, 1961, Paris gave defendant the forty-one capsules found on him when he was arrested, to hold "until he came back from the barber shop," for "he would be right back." Forty-five minutes later officers entered Smith's apartment with a search warrant. Smith was detained on the telephone talking to another officer at the time. When the officers announced their identity and their possession of the search warrant, Smith took the forty-one capsules from his shirt pocket and delivered them to the officers.

Under these particular circumstances, including the *express admission by defendant Smith on the stand that he had possession of the narcotics* for forty-five minutes (331 F.2d p. 791), the court ruled that the question of whether the admitted possession by defendant was a result of the creative activity of the police, or was a cause of the manufacturing of crime by law enforcement officials, should have been presented to the jury under proper instructions.

Under the peculiar facts of the Smith case, we agree that the issue of a "frame-up" or entrapment was for the jury's consideration. But those facts are not here present. Here there was no admitted actual possession of the narcotics by the defendant Ortega. Here there is not the slightest indication the police wanted, or knew, that Strickland would do what he now asserts he did—impose upon Ortega. Not until Strickland contradicted his original signed statement in the courtroom was there any knowledge in the government agents as to what Ortega and Strickland now assert Strickland did. We do not consider the Smith v. United States case, supra, controlling.

The judgment is affirmed.