UNITED STATES of America,
Appellee,

v.

John Marez MARTINEZ, Appellant.

UNITED STATES of America,
Appellee,

v.

Manuel A. ROJAS, Jr., Appellant.

UNITED STATES of America,
Appellee,

v.

Carlos Perez HAMILTON, Appellant.

Nos. 23769–23771.

United States Court of Appeals,
Ninth Circuit.

June 18, 1970.

Thomas A. Zlaket (argued for #23-769), Leon Thikoll (argued for #23-770), James Johnston, Gilbert Gonzales (argued for #23771) Tucson, Ariz., for appellants.

JoAnn D. Diamos (argued), Asst. U. S. Atty., Richard K. Burke, U. S. Atty., Tucson, Ariz., for appellees.

Before HAMLEY, BROWNING and ELY, Circuit Judges.

HAMLEY, Circuit Judge:

John Marez Martinez, Manuel A. Rojas, Jr., and Carlos Perez Hamilton, were jointly tried before a jury and convicted on the various narcotic charges set forth in the joint indictment summarized in the margin.[1] They have prosecuted separate appeals which we have consolidated for argument and disposition.

---

[1]. Martinez and Rojas were charged with selling 9.8 grams of heroin to Phillip E. Jordan on September 13, 1968 (count one), and 38.1 grams of heroin to Jordan on September 18, 1968 (count two), such sales not being pursuant to a written order of Jordan on a form issued by the Secretary of the Treasury, in violation of 26 U.S.C. § 4705(a), and 18 U.S.C. § 2.

Martinez, Rojas and Hamilton were charged with selling 107.9 grams of heroin to Jordan on September 25, 1968 (count three), also in violation of the same provisions of 26 U.S.C. § 4705(a) and 18 U.S.C. § 2.

Martinez, Rojas and Hamilton were charged with conspiring together, and with others, between the 12th and 25th of September, 1968, to violate 21 U.S.C. §§ 173 and 174 (count four). This count

We first summarize the evidence tending to support the conviction. About 8:00 p. m. on September 12, 1968, one day prior to the count one narcotics transaction, Phillip Jordon, an agent of the Bureau of Narcotics and Dangerous Drugs, went to Rojas' home in Tucson, Arizona. Giving his name as Victor (Vic) Forti, Jordan told Rojas he was looking for Julian and Tony, two narcotics addicts, in order to purchase some heroin. Rojas called Martinez, who was sitting in another room of Rojas' home, and introduced him to "Victor Forti." Jordan repeated his story to Martinez, adding that he wanted to take some heroin back to the West Coast.

Jordan then asked Rojas if the latter could sell him some heroin since he could not locate Julian or Tony. Rojas asked Martinez if it would be possible to get some heroin that night. Martinez replied that he would try. Rojas then instructed Martinez to get the heroin and told Jordan to return to Rojas' house about 9:30 p. m. At approximately 9:45 that evening, Jordan went back to Rojas' home and was met by Martinez outside the house.

Martinez told Jordan that everything was ready and that he would be able to sell the heroin. He said, however, that he wanted to see the money first. Some discussion ensued, and it was finally agreed that if Jordan decided to purchase the heroin, he would meet Martinez at the latter's Tucson apartment. At approximately 11:00 o'clock that evening, Jordan met Martinez at the latter's apartment. There were further negotiations between Jordan and Martinez, and Jordan gave Martinez two hundred dollars. Martinez left his apartment, returned about 3:15 a. m., and handed Jordan a package containing 9.8 grams of heroin.

About 10:30 p. m. on September 17, 1968, Martinez telephoned Jordan at Tempe, Arizona. Martinez told Jordan that he had received a shipment of four or five ounces of heroin and asked if Jordan wanted to buy any of it. As a result of this telephone call, Jordan went to Martinez' apartment at about 1:00 p. m. on September 18, 1968. As Jordan was walking up to the door, Martinez and Rojas drove up. All of them went into Martinez' apartment.

While they were discussing a sale of two ounces of heroin to Jordan, Rojas asked Jordan if he would be interested in thirty ounces. Rojas stated that he was going to receive that amount the following week. Rojas added that the heroin was pure uncut, direct from the laboratory at Santa Ana, Mexico. Jordan said he could take about twelve or fifteen ounces. It was agreed that, as to the prospective purchase, Martinez and Rojas would telephone Jordan on September 23, 1968.

Concerning the two-ounce purchase Jordan was attempting to make on September 18, 1968, Martinez and Rojas told Jordan to come back to the apartment at 4:30 p. m. on that day. Martinez then asked Jordan whether the latter wanted to buy any marijuana. There was some discussion about this, and Jordan stated that he would let Martinez and Rojas know whether he wanted any marijuana when they called him on September 23rd. Martinez and Rojas then left.

Jordan went back to Martinez' apartment at the appointed time the next afternoon. A half hour later Martinez arrived with another person, introduced to Jordan by Martinez as Emilio Ruiz, the source of Martinez' and Rojas' supply.[2] Ruiz handed Jordan a rubber container holding 38.1 grams of heroin, for which Jordan gave Martinez and Ruiz $850.

charged that as part of their conspiracy they would wilfully and knowingly receive, conceal, buy, sell, and facilitate the transportation, concealment and sale of 155.8 grams of heroin after it had been imported into the United States contrary

to law, the defendants knowing the heroin would be so imported.

2. Ruiz was named in counts two, three and four of the indictment, but he was never apprehended.

It was then agreed that Martinez and Ruiz would telephone Jordan at Tempe on September 23, 1968. There was also some discussion about the price of marijuana at this time, but no transaction was agreed upon.

About 10:30 on the night of September 23rd, Jordan, at his home in Tempe, received a collect telephone call from Martinez. As a result of this call, and another collect telephone call from Martinez at 4:00 a. m. on September 24th, Jordan agreed to meet with Martinez on the morning of September 25. At 11:30 that morning, Jordan arrived at Martinez' apartment. He found a note reading, "Vic, I will be back in twenty minutes, John." About 11:55 a. m. Martinez drove up with another person whom Jordan recognized as Carlos Hamilton.

Jordan made it appear that he did not want to meet Hamilton, but Martinez told him he did not have to worry about Hamilton, as the latter was in on the deal with Martinez, Ruiz and Rojas. Jordan asked Martinez for the heroin. Martinez walked into the bathroom and returned with a plastic bag holding five rubber containers holding a total of 107.9 grams of heroin.

Martinez handed the package to Jordan and, with Hamilton, assisted Jordan in opening it. Jordan then asked Hamilton if he could purchase ten more ounces of heroin. Hamilton replied that he and Martinez would have to sell five ounces to Jordan first, and then, in about seven hours, they could sell him ten ounces more. There was further discussion, and Hamilton told Jordan that after the latter had paid Hamilton for the five ounces, they would guarantee Jordan at least ten or fifteen more ounces that night.

The three then walked to Jordan's car where he said he had the money hidden in the trunk and where he wanted to hide the heroin. Jordan gave a signal and, with the assistance of another Bureau agent who had been maintaining surveillance, placed Hamilton and Martinez under arrest. Rojas was arrested that afternoon. Defendants did not, with regard to any of these transactions, ask for a written order form from Jordan issued in blank by the Secretary of the Treasury or his delegate.

All three of the defendants testified and offered other evidence. Rojas denied any participation in the narcotics transactions. He also offered evidence to the effect that Mrs. Rojas had ordered Jordan off their premises on September 12, 1968; that Rojas warned Martinez not to deal with Jordan; and that he went to Martinez' apartment early on September 18, to fix the evaporative cooler, but was elsewhere later in the day. Hamilton offered testimony tending to minimize his association with the other defendants and denied any participation in the transactions. Martinez testified that he participated in the transactions only after Jordan persisted in his efforts to buy heroin, and "flashed" a roll of bills at him.

Defendants contend that 21 U.S.C. §§ 173 and 174, as applied to their alleged trafficking in heroin, are unconstitutional under the rationale of Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). This contention is foreclosed by Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970). Defendants also assert that 26 U.S.C. § 4705, as applied to them, is unconstitutional under the rationale of Leary. This contention is disposed of by Minor v. United States, 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969).

All three defendants argue that the trial court erred in denying their respective pretrial motions for separate trials.[3]

All of the defendants took the witness stand in their own defense and were subjected to cross-examination. There was accordingly no confrontation problem such as the Supreme Court dealt with in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). But defendants argue that con-

---

3. Hamilton renewed his motion for coverance during the course of the trial.

siderations of justice and fairness entitled them to severance.

Martinez emphasizes the complexity and variety of the issues and urges that his entrapment defense "got lost in the shuffle." He calls special attention to the court's instructions concerning the conspiracy count, the effect to be given to evidence in a case involving multiple defendants, and the charge of "aiding and abetting." Martinez asserts that these instructions, augmented because of the joint trial, were too confusing and complicated for lay jury members to grasp.

Rojas does not suggest any special considerations which made severances necessary. Hamilton asserts that because he was charged only under the third and fourth counts, he was prejudiced by the evidence pertaining to counts one and two. In this connection he urges that no testimony was offered tending to show that the conspiracy with which he was charged (count four) involved him in the first two transactions.

Absent some special problem such as that dealt with in *Bruton*, the granting or denial of a motion for the separate trial of jointly-indicted defendants rests within the sound discretion of the trial court. Loux v. United States, 389 F.2d 911, 920 (9th Cir. 1968). Moreover, as recently pointed out by this court in Parker v. United States, 404 F.2d 1193, 1196 (9th Cir. 1968), there is a substantial public interest in the joint trial of persons charged with committing the same offense or with being accessory to its commission.

These three codefendants were tied together by the conspiracy charge. In addition, Martinez and Rojas were charged on all three substantive counts. It is quite true, as Hamilton argues, that he was not charged under counts one and two. But the jury was carefully instructed that Hamilton was charged only under counts three and four, and this

was also made clear by the form of verdicts which were submitted to the jury. We find nothing in the record to support the view that Hamilton's conviction under count three was brought about, even in part, by the evidence produced against the other defendants under counts one and two. Hamilton's conviction under the conspiracy count is further discussed below.

We are impressed with the care exercised by the trial court, during the course of the trial, and in the instructions, to guard the individual interests of the defendants. None of them complain of any of the instructions. Each were represented by separate counsel who vigilantly protected the interests of his own client. We conclude that the trial court did not, under the circumstances of this case, abuse its discretion in denying the motions for severance.

Martinez argues that he was prejudiced by this court's holding, in a long line of cases, that the defense of entrapment is not available to an accused who denies having committed the crime charged.[4] Martinez asks this court to recede from that view, asserting that some other circuits now allow an accused to put the Government to its proof and still rely on the defense of entrapment.

In the context of the present case, this contention presents only an abstract question, unrelated to any claimed error on the part of the trial court. Martinez did not ask the trial court for any relevant ruling, and the trial court made no ruling pertaining to this question. Martinez' entrapment defense was predicated solely upon his testimony concerning his participation in the transactions. Had he not so testified there would have been little evidence in his favor on that question. We hold that, under the circumstances of this case, this argument by Martinez, whatever its inherent merits, provides no ground for reversal.

4. Among the cases in which this court has so held, are Rios–Ramirez v. United States, 386 F.2d 831 (9th Cir. 1967); Ortiz v. United States, 358 F.2d 107, 108 (9th Cir. 1966); and Ortega v. United States, 348 F.2d 874, 875–876 (9th Cir. 1965).

Martinez also argues that the trial court erred in not ruling, as a matter of law, that Martinez was entrapped.

Once the issue of entrapment appeared with respect to Martinez, it became the prosecution's burden to establish beyond a reasonable doubt that Martinez was not entrapped into the commission of the offense. *See* Notaro v. United States, 363 F.2d 169, 175 (9th Cir. 1966). If the proof and counterproof on the issue depend upon credibility factors or inferences to be drawn from conflicting evidence, the question is one of fact for the jury. Hattem v. United States, 283 F.2d 339, 341–342 (9th Cir. 1960). Entrapment as a matter of law is established only where the testimony is undisputed that a person having no predisposition to commit offenses of the kind complained of was induced to do so by the trickery, persuasion, or fraud of a Government agent. United States v. Saucedo, 346 F.2d 371, 372 (7th Cir. 1965).

Viewing the evidence as a whole, we do not believe that Martinez' showing on the issue of entrapment was either undisputed or free from credibility factors. Martinez testified that on the occasion of their first meeting, Rojas and his wife entered the house and Jordan followed Martinez to his car and there kept talking to Martinez. On rebuttal three state agents testified to the contrary. Martinez testified that on September 18th he was alone and Rojas was not present. Five Government witnesses testified to the contrary. Rojas testified that Mrs. Rojas ordered Jordan out of her house on September 12, 1968. Jordan denied this.

The jury heard and observed Martinez. We are unable to determine how they appraised his credibility, or to make any such appraisal of our own. We therefore conclude that the trial court did not err in denying Martinez' motion for judgment of acquittal made on the ground of entrapment as a matter of law.

Martinez contends that remarks made by the United States Attorney in front of the jury were of such a character as to be prejudicial to the rights of Martinez. The reference here is to comments made by the United States Attorney with regard to certain marks on Martinez' arm.

We have examined the trial incidents in question, and have concluded that they do not provide a basis for reversal. Counsel for Martinez asked the trial court to strike one such comment. This was promptly done, and the court instructed the jury to disregard the comment. There was no motion for a mistrial, and a mistrial would not have been warranted.

Martinez makes a generalized contention that the opening remarks of counsel for codefendant Hamilton and the evidence offered by this codefendant were so damaging as to deny Martinez a fair trial. Martinez does not particularize this contention, nor does he provide record references to the comments he has in mind. In the form presented, this contention does not warrant consideration on this appeal.

Rojas argues that the trial court erred in admitting the testimony of the Government witness, Jordan, concerning marijuana discussions with Rojas. Martinez joins in this argument.

Under direct examination, Jordan told of a conversation he had with Martinez and Rojas at Martinez' apartment, on September 18, 1968. Jordan testified that they discussed possible heroin transactions. Counsel for the Government then asked Jordan if there had been any discussion about marijuana. Jordan replied that Martinez had initiated such a discussion and gave the details of that conversation. According to Jordan, Rojas joined in this discussion, quoting a price of sixty-five dollars per kilo for marijuana. No objection to this testimony was made by any of the defendants.

It is true that the sale of marijuana is an offense distinct from the sale of heroin, being covered by 21 U.S.C. § 176a. However, Jordan's un-

solicited reference to the marijuana discussion was not substantially prejudicial. Jordan had just testified that Rojas and Martinez had discussed possible heroin transactions. His further testimony that they also discussed possible marijuana transactions thus could not have hurt Rojas and Martinez much more than they had already been hurt. We find no plain error here.

■ ■ ■ Rojas devotes one paragraph of his opening brief to the contention that he was prejudiced because the Government's witness, Jordan, offered an unsolicited statement referring to the defendant Manuel Rojas as "a major source of heroin."

It was during Rojas' cross-examination of the Government witness, Jordan, early in the trial that the latter made this unresponsive comment:

> "If you are talking about an agreement of my senior agent and myself, this is what we agreed on as far as initiating a case against the major sources of supply, Manuel Rojas."

Counsel for Rojas immediately moved that this remark be stricken. The trial court instructed the jury at once to disregard the remark. Counsel for Rojas then resumed his cross-examination of Jordan and did not move for a mistrial.

While the remark was uncalled for, it is clear that Government counsel had no responsibility in the matter. Having in view the totality of the evidence, we question whether the matter was suffi-

ciently prejudicial to warrant a mistrial. But, in any event, the trial court was given no opportunity to make such a determination. We hold that this incident does not entitle Rojas and Martinez to a reversal.[5]

■ ■ ■ Hamilton argues that the evidence was insufficient to convict him on count three, which involved the heroin transaction on September 23, 1968. Accordingly, he contends, the trial court erred in denying his motion for judgment of acquittal. In our view the evidence was adequate.

■ ■ ■ He also makes the same argument with respect to the sufficiency of the evidence on count four, which alleges a conspiracy between the three defendants and others. Insofar as Hamilton's participation is concerned, the evidence in support of the count four conviction is, to say the least, thin, although plainly not so insubstantial as to render the conspiracy count a sham with respect to Hamilton. But we need not decide whether the evidence as to Hamilton's complicity in the conspiracy is sufficient. Hamilton's sentence under count four is concurrent with his sentence under count three, which, as stated above, is supported by the evidence. *E. g.* Benton v. Maryland, 395 U.S. 784, 787–791, 89 S. Ct. 2056, 23 L.Ed.2d 707 (1969).

The other claimed errors have been considered, but we find them so lacking in merit as not to warrant discussion.

Affirmed.

---

5. Rojas also complains that Jordan's testimony that Rojas had stated he was "fighting a Customs case" was non-responsive and prejudicial. During cross-examination of Jordan by Rojas' counsel, the latter was exploring the nature of the conversation which took place at Rojas' home on September 12, 1968. Counsel for Rojas told Jordan that he was interested in "the exact wording" of the conversation which took place between him and Rojas. Shortly thereafter this colloquy occurred:

> "Q * * * Did Manny Rojas say anything to you accusing you of being a Federal Agent?
>
> "A No, sir, not in that sense of the word.

> "Q In what sense of the word? Did he make any accusation affecting your credibility?
>
> "A I can tell you what he said.
>
> "Q Please.
>
> "A Okay. He stated it was a coincidence that I would show up at his house in an attempt to purchase heroin while he was going through the courts fighting a Customs case."

The above colloquy indicates that Jordan's observation was directly responsive. Moreover, Rojas did not ask that the remark be stricken, or that the jury be instructed to disregard it.