[Cite as *State v. Stein*, 2013-Ohio-3050.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 25432 |
| Plaintiff-Appellee | : | |
| | : | Trial Court No. 2012-CR-786 |
| v. | : | |
| | : | |
| SAMUEL C. STEIN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 12th day of July, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHELE D. PHIPPS, Atty. Reg. #0069829, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ELIZABETH C. SCOTT, Atty. Reg. #0076045, 120 West Second Street, Suite 703, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FAIN, P.J.

{¶ 1}    Defendant-appellant Samuel Stein appeals from his conviction and sentence for

Conspiracy to Commit Aggravated Murder.   Stein contends that his conviction is not supported

by the evidence in the record, and is against the manifest weight of the evidence. He also contends that the trial court should have sentenced him to community control sanctions, and abused its discretion by imposing a nine-year prison sentence.

{¶ 2} We conclude that Stein's conviction is supported by the evidence in the record, and is not against the manifest weight of the evidence. We also conclude that the trial court did not abuse its discretion by imposing a nine-year prison sentence. Accordingly, the judgment of the trial court is Affirmed.

## I. Stein Conspires with his Apartment Mate and Ex-Girlfriend
## to Murder a Previous Ex-Girlfriend and the Mother of his Child

{¶ 3} Stein had a romantic relationship with Nicole Mausolf that lasted from late 2004 to late 2007. They had a son together.

{¶ 4} Stein later became romantically involved with Andrea Ramga, and moved into Ramga's apartment in April 2011. Although their romantic involvement ended after three to four months, Stein continued to live in Ramga's apartment, paying her rent.

{¶ 5} Ramga became aware that Stein "hated" Mausolf, who had taken him to court over child support issues more than once, with the result that Stein was jailed for contempt and lost one of his two jobs. Stein continued to work at a McDonald's restaurant.

{¶ 6} "A couple of months" after Stein moved in with Ramga, he began discussing a plan to kill Mausolf. For a while, Ramga did not take Stein seriously, believing that this was just Stein's way of expressing his hatred for Mausolf, and what Mausolf had done to him.

{¶ 7} One Thursday, Stein told Ramga, "if we do this on Friday, I have the weekend off

so I can clean up." According to Ramga, "that's when I knew that he was serious. He wanted to do it and he wanted to do it now." Ramga testified that she was afraid for her life for two reasons: first, Stein was exhibiting a propensity to kill his ex-girlfriends, a group to which she belonged; and second, the plan would result in Ramga and Stein being the only surviving witnesses to Mausolf's murder, which could motivate Stein to eliminate Ramda as a witness.

{¶ 8} Ramga called the Miamisburg Police Department the following Monday, March 5, 2012, told them that she was afraid of her roommate, and asked what her options were to get him out of her apartment. Miamisburg Police Officer Justin Small called her back and an appointment was made for her to meet with him later that evening.

{¶ 9} During her meeting with Officer Small, Ramga reported that her roommate, Stein, was asking her to assist him in killing his ex-girlfriend, Mausolf. Small then recalled that Stein had come to the police station to complain about Mausolf's having sent harassing text messages to Ramga, and Small had been the police officer who had met with Stein. Small had explained to Stein at that time that Ramga would need to make a complaint in order to initiate any action.

{¶ 10} In fact, after Stein had met with Small, he had prevailed upon Ramga to come to the police station with him to complain about Mausolf. Although Ramga had found Mausolf's text messages annoying, she enjoyed a good relationship with Mausolf, and did not consider any of the messages to be harassing. She agreed to go with Stein to the police station because she was afraid of him. The police officer who met with Stein and Ramga (not Officer Small) said that she would call Mausolf to get her to "back off."

{¶ 11} The police officer's plan to call Mausolf was not acceptable to Stein, so no

complaint against Mausolf was filed. It was not acceptable to Stein because it was inconsistent with his plan to kill Mausolf. That plan required Ramga to befriend Mausolf, while simultaneously complaining that Mausolf was harassing her. Ramga would then ask Mausolf to come to the apartment some evening after work, where Stein would shoot Mausolf in the face with a shotgun. Stein would then claim that Mausolf had come into the apartment uninvited, and then advanced upon him menacingly, as a result of which Stein had shot her. Stein discussed the fact that he would have to be sure he could kill Mausolf with one shot, since multiple shots would militate against his defense of self-defense. To be sure of killing Mausolf with one shot, Stein would shoot her in the face with a shotgun, at close range.

{¶ 12} Officer Small had Ramga call Stein to discuss the plan to kill Mausolf. Stein said nothing in response, and eventually hung up. A recording of this phone call was played for the jury and admitted in evidence. Officer Small then passed Ramga on to Police Detective Ring. Small had no further contact with Ramga.

{¶ 13} The next day, Tuesday, March 6, 2012, Ramga went to the McDonald's where Stein worked, wearing a body wire, and asked to speak with him. A recording of this two-part conversation was played for the jury and admitted in evidence. In the first part, Ramga told Stein that she had decided that: "I think I'm in. I think she's gotta go." Ramga then asked Stein when he wanted to do it, to which Stein responded: "As soon as possible."

{¶ 14} Ramga asked Stein if he wanted to do it the next night, adding that she could call Mausolf and ask her to meet Ramga at the apartment about 8:00. Stein replied: "Yeah." Ramga then asked Stein if she should be in the back room or in the bathroom. Stein responded: "You want, just, just let her in and then go in the bathroom." Stein then added: "And then, and

then, you know, you were in the bathroom, I heard the door open, I came out, and whoa ... ."

{¶ 15}  Ramga then told Stein that she could call Mausolf from her mother's house and block the number, but Stein said: "I wouldn't do that."  Later in this conversation, Stein explained why he did not want to interfere with the ability to trace the call back to Ramga – he could incorporate the phone call from Ramga to Mausolf into his plan: "But anyway, so, I mean, so basically, you know, we, you called her, told, you know, told her to quit callin' and textin' or you were gonna call the police, and you know, that was it, you didn't think anything else was gonna happen, you know, you know, you felt better about it.  The next thing we know she shows up."

{¶ 16}  After Ramga then said: "She shows up and walks in the house," Stein continued: "She shows up and walks in the house while you're in the bathroom.  I came out and saw her, told her to get the f*ck out, she wouldn't leave, she came at me, I let her have it, and you heard the scuffle and came out, freaked out, and you know, I said, I'm callin' the police."

{¶ 17}  After Ramga then said: "Okay," Stein said: "I mean, that's, the simpler, the better."  This part of the conversation continued, but nothing of further consequence was said.

{¶ 18}  Stein went back into the McDonald's after this part of the conversation. Detective Ring, who, with another officer, was parked elsewhere in the McDonald's lot, then called Ramga and asked her to see if she could get Stein to discuss the role of the shotgun in the plan to kill Mausolf.  Ramga had asked Stein: "You still have your shotgun, right," to which Stein responded affirmatively, but there had been no other mention of the shotgun.

{¶ 19}  Ramga then succeeded in getting Stein back out of the McDonald's where he worked.  She asked him: "Um, how am I, I'm not going to get hit with the shotgun bullet?"

Stein replied: "You're gonna be in the bathroom."

{¶ 20}   After a couple more exchanges, Stein referred to the fact that he would "get my shotgun," and "get in the kitchen, behind the stove."[1]

{¶ 21}   At the end of this, the second part of the two-part conversation, Stein told Ramga to keep her part "really simple."   After reviewing her part with Ramga one more time, Stein concluded with: "And I'll take care of the rest."

{¶ 22}   During this entire conversation, Stein expressed no reticence whatsoever about the plan to kill Mausolf.  As the State argues, the conversation is at least consistent with, if it does not suggest, that the plan they were discussing had been formulated by Stein, as Ramga testified.   But even if it weren't, Stein evidenced complete willingness to participate in the conspiracy.

{¶ 23}   The next day, March 7, 2012, a little after 1:00 p.m., Ramga met Stein again at the McDonald's where he worked.  Again, she was wearing a body wire, and her conversation was recorded.   During this conversation Ramga told Stein that Mausolf had called her and left a message, which would give Ramga "one more reason to call" Mausolf.   Ramga told Stein she figured he would want to be there when she called Mausolf, to which Stein responded: "Oh yeah, definitely."

{¶ 24}   Ramga asked Stein what she should say to Mausolf.   Stein told Ramga: "Okay, yeah, you, you kicked me out, uh, you got together all my stuff and you're, you know, I left some

---

[1]Besides the actual audio-recording of the two-part conversation between Ramga and Stein on March 6, 2012, the State prepared a written transcript of this conversation, which was given to the jury as an aid to their listening to the recording, but which they were not allowed to keep as evidence.    Stein's comments quoted here were interlineated in the typed transcript.    We have listened to the entire recording, and what we have quoted here, which differs slightly from the interlineation, is what we heard Stein say.

books behind, you can say that a friend came and got me or something like that, you know, but uh, you kicked me out, you had the locks changed, and uh, if you want, you know, tell her that you're not going to get home until after ... "

{¶ 25} After some brief discussion, Ramga asked Stein if 8:00 that evening would be O.K. as the time that Mausolf should be told to come to the apartment, and Stein agreed, saying: "That would give us time to go home and set the house up, and tell her trash comes tomorrow so if she wants it ... ."

{¶ 26} Ramga then purported to make the call to Mausolf. In reality, in a prior arrangement with the police, she was speaking to a secretary in the Miamisburg police department, who was told to respond naturally. It appears that Stein could not overhear the other end of the conversation; Ramga had begun by asking to speak with Nicole [Mausolf], before addressing the party on the other end of the line as Nicole, and Stein asked Ramga, after the brief phone call: "Who answered the phone?" Ramga told him that Nicole had answered the phone.

{¶ 27} Ramga then appeared to be asking Stein to go over the plan one more time, and Stein did so. He told Ramga that he would be in the kitchen, behind the stove, that Ramga should let Mausolf in, then excuse herself and go in the bathroom and shut the door. Stein continued: "And, I'll take it from there, and uh, what happened is, you were in the bathroom, I was in the kitchen gettin' ready to do some laundry, she barged in, told her to get the f*ck out, she wouldn't, I went and got my shotgun and told her to get out, by that time she was closing in on me, I let her have it."

{¶ 28} Stein then explained to Ramga that by having been in the bathroom while Stein was shooting Mausolf with the shotgun, she would not have to relate a story about what Stein

said and did, and what Mausolf said and did.

{¶ 29}  Stein then told Ramga that he would be home before eight; Ramga responded: "Okay.  See you then"; and Stein said: "All right.  Have fun."  The conversation then ended.

{¶ 30}  The police went into the McDonald's where Stein had returned to work, and arrested him.

## II.   The Course of Proceedings

{¶ 31}  Stein was charged by indictment with two counts of Conspiracy to Commit Aggravated Murder, and two counts of Conspiracy to Commit Murder.  Mausolf was the intended victim in all four counts.  All four counts are felonies of the first degree.  R.C. 2923.01(J)(1).  With respect to the counts involving Aggravated Murder, Stein was charged both with Conspiracy in violation of R.C. 2923.01(A)(1), and with Conspiracy in violation of R.C. 2923.01(A)(2).  Similarly, with respect to the counts involving Murder, Stein was charged both under R.C. 2923.01(A)(1) and R.C. 2923.01(A)(2).

{¶ 32}  R.C. 2923.01(A)(1) provides that no person shall: "With another person or persons, plan or aid in planning the commission of [the specified offense]."  R.C. 2923.01(A)(2) provides that no person shall: "Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of [the specified offense]."

{¶ 33}  R.C. 2923.01(B) provides as follows:

No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's

entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed.

**{¶ 34}** At trial, each of the four verdict forms corresponding to the four counts of the indictment was accompanied by eleven interrogatories asking the jurors to determine if Stein had committed certain specified overt acts. These sets of interrogatories were identical with respect to each of the four counts. With respect to each count, the jury returned nine of the interrogatories (numbers two through ten) with a unanimous finding that Stein did commit the specified overt act. The jury returned two of the interrogatories (numbers one and eleven) with a unanimous finding that Stein did not commit the specified act.

**{¶ 35}** The overt acts that the jury found Stein to have committed were:

On 3/6/12, he instructed Ramga what to say to Mausolf to lure her to the residence in order to facilitate Mausolf's murder.

On 3/6/12, he instructed Ramga what to do at the residence in order to facilitate Mausolf's murder.

On 3/6/12, he instructed Ramga what to say to police investigators in order to facilitate Mausolf's murder.

On 3/6/12, he took a second break from work to meet with Ramga to clarify details of his plan to murder Mausolf.

On 3/7/12, he took a break from work and met with Ramga to place a phone call to Mausolf to commence his plan to lure Mausolf to the residence later that evening for the purpose of killing her.

On 3/7/12, he told Ramga what to say in her phone call to Mausolf to lure her to the residence later that evening.

On 3/7/12, he instructed Ramga what to do at the residence in order to facilitate Mausolf's murder later that evening.

On 3/7/12, he instructed Ramga what to say to police investigators in order to facilitate Mausolf's murder.

On 3/7/12, he met with Ramga and presided over the phone call from Ramga to Mausolf, to commence his plan to kill Mausolf.

**{¶ 36}** The jury found Stein guilty of all four counts. By agreement of both parties, the counts were merged for sentencing purposes. Stein was sentenced to nine years in prison. No fine or restitution was ordered. From his conviction and sentence, Stein appeals.

### III. Stein's Conviction Is Not Against the Manifest Weight of the Evidence

**{¶ 37}** Stein's First Assignment of Error is as follows:

MR. STEIN'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 38}** We set forth the manifest-weight standard of review in *State v. Szloh*, 189 Ohio App.3d 13, 2010-Ohio-3777, 937 N.E.2d 168, ¶ 12 (2d Dist.):

* * * when reviewing a judgment under a manifest-weight standard of review, " '[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way

and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction.' " [*State v.*] *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 39} Ramga testified that Stein planned Mausolf's murder with her, and agreed with her that he would murder Mausolf. Recordings of her conversations with Stein in which he planned, and agreed to, Mausolf's murder were admitted in evidence. Stein did not testify.

{¶ 40} Stein's defense at trial, and his argument on appeal, is that he was entrapped. He argues that Ramga, at the behest of the police, put the idea of planning to murder Mausolf in Stein's mind, and planned to use Stein's willingness to kill Mausolf as a basis for evicting Stein from her home.

{¶ 41} In *State v. Doran*, 5 Ohio St.3d 187, 193, 449 N.E.2d 1295 (1983), the Supreme Court of Ohio held that entrapment is an affirmative defense. They defined the defense of entrapment:

> Consequently, where the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute, the defense of entrapment is established and the accused is entitled to acquittal. *Sherman* [*v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958)], *supra*, 356 U.S. at 372, 78 S.Ct. at 820; *Sorrells* [*v. United States*, 287 U.S. 435,

53 S.Ct. 210, 77 L.Ed. 413 (1932)], *supra*, 287 U.S. at 442, 53 S.Ct. at 212. However, entrapment is not established when government officials "merely afford opportunities or facilities for the commission of the offense" and it is shown that the accused was predisposed to commit the offense. *Sherman, supra*, 356 U.S. at 372, 78 S.Ct. at 820. *Id.*, at 192.

**{¶ 42}** The Supreme Court of Ohio adopted a subjective test for determining a defendant's predisposition to commit the offense, concluding:

Our sole reservation concerning the subjective test involves the scope of admissible evidence on the issue of an accused's predisposition. While evidence relevant to predisposition should be freely admitted, judges should be hesitant to allow evidence of the accused's bad reputation, without more, on the issue of predisposition. Rather, while by no means an exhaustive list, the following matters would certainly be relevant on the issue of predisposition: (1) the accused's previous involvement in criminal activity of the nature charged, (2) the accused's ready acquiescence to the inducements offered by the police, (3) the accused's expert knowledge in the area of the criminal activity charged, (4) the accused's ready access to contraband, and (5) the accused's willingness to involve himself in criminal activity. Under this approach, the evidence on the issue of an accused's predisposition is more reliable than the evidence of the nature of inducement by police agents under the objective test. *Id.*

**{¶ 43}** In applying the *Doran* test for a defendant's predisposition to commit an offense, the Ohio Tenth District Court of Appeals rejected a claim of entrapment, noting that the witness

had indicated that the defendant had never expressed an unwillingness to commit the offense, and concluding that the evidence "does not suggest that appellant had to be convinced to engage in this conduct."  *State v. Zeune*, 10th Dist. Franklin No. 10AP-1102, 2011-Ohio-5170, ¶ 20.

{¶ 44}  In the case before us, the jury could easily have found from the evidence that the idea of planning to kill Mausolf originated with Stein, not with Ramga.  Ramga so testified, and the recorded conversations between Ramga and Stein are more consistent with the idea of killing Mausolf having originated with Stein, not with Ramga.

{¶ 45}  But even if one were to conclude that the idea of killing Mausolf was suggested to Stein by Ramga, the recorded conversations clearly show that Stein was not the least bit reticent about killing Mausolf.  He never indicated any unwillingness or reluctance to do so.

{¶ 46}  The jury reasonably concluded that Stein was not entrapped.  This is not the exceptional case in which the evidence weighs heavily against conviction.  Stein's First Assignment of Error is overruled.

### IV.   Stein's Conviction Is Supported by Sufficient Evidence

{¶ 47}  In part III, above, we have held that Stein's conviction is not against the manifest weight of the evidence.  Therefore, it is supported by sufficient evidence, since there is evidence in the record, in the form of Ramga's testimony and the recorded conversations between Ramga and Stein, that, if believed, would persuade a reasonable mind of Stein's guilt beyond reasonable doubt.  *State v. Jenks*, 61 Ohio St.3d 259, 263, 574 N.E.2d 492 (1991), superseded on other grounds by constitutional amendment, *see State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668.  *See also State v. Bailey*, 2d Dist. Montgomery No. 24861, 2012-Ohio-3274, ¶ 25.

**{¶ 48}** Stein's Second Assignment of Error is overruled.

### V. Stein's Nine-Year Sentence Is Not an Abuse of Discretion

**{¶ 49}** Stein's Third Assignment of Error is as follows:

THE TRIAL COURT ERRED BY SENTENCING MR. STEIN TO A SENTENCE GREATER THAN THE MINIMUM.

**{¶ 50}** Stein's sentence could have been three, four, five, six, seven, eight, nine, ten, or eleven years. R.C. 2929.14(A)(1). He was sentenced to nine years, six years more than the minimum, and two years less than the maximum.

**{¶ 51}** In his argument in support of this assignment of error, Stein argues that he should have received community control sanctions, rather than a prison term, since he was a first-time felony offender. But as the State points out, it is presumed that a prison term is necessary for an offender who has committed a first-degree felony. R.C. 2929.13(D)(1).

**{¶ 52}** Before imposing sentence, the trial court heard from Mausolf, Stein's intended victim and the mother of his child. She spoke eloquently of her fear that Stein might succeed in posting bond before trial, leading to "months of anxiety, and hypervigilance, having panic attacks whenever someone knocks on my door, and being afraid to leave the house. Samuel was plotting to kill me and I have no doubt he would have succeeded had Andrea not come forward."

**{¶ 53}** Even worse, Mausolf said, was the detrimental effect Stein's crime had on their six-year-old son:

It had come to my attention that Samuel had discussed his plan to kill me while in our son's presence. Looking back at our son's behavior, changes in

behavior since last November, this fact is evident. He is seeing a therapist, but, being mildly autistic, he has difficulty expressing his emotions and feelings. And this complicates his healing process. Our son has expressed that he feels he is to blame for this whole situation. And self-blame is a very common reaction to trauma in children

The fact that my six-year-old son thinks it's his fault his father was planning to murder me breaks my heart. It causes me so much pain to see him hurting and unhappy. He is six years old, way too young to have such heavy thoughts and guilt. He continues to wake up at night crying and, at times, becomes very clingy to me. He also often draws pictures of a person shooting another person, putting long hair on the person being shot, which leads me to believe he is drawing Samuel shooting me.

**{¶ 54}** Ramga, also, gave a statement at the sentencing hearing, which was read for her by a victim advocate. In that statement, Ramga said:

I fear Samuel Stein. I'm so afraid that I watch cars on the road. If someone's hiding [sic] behind me long enough, I take note of the license number and change my route. I have panic attacks every time someone knocks on my door. I have nightmares almost every night. When I'm able to actually sleep, I'm suspicious of my own neighbors. I'm afraid to be out after dark. Samuel Stein planned Nicole's murder and wanted me to help. I did the only thing I could think of to stop him and save her life.

I implore the Court for the maximum sentence for Samuel. I would like

to feel safe and start my life again. I have changed everything about myself and I still feel scared. I'm afraid Samuel will come after me when he is released and I have no doubt he will try. He is smart and capable of almost anything except remorse.

**{¶ 55}** In imposing sentence, the trial court noted that Stein had continually denied any involvement in the offense, despite his own words in the recorded conversations. The trial court also noted that Stein continued to have the perception that he would be living with Ramga again after his release, as noted in the pre-sentence investigation report. The trial court took this to be not just a denial of the circumstances, but also to be a denial of the wrongfulness of Stein's conduct.

**{¶ 56}** The trial court commented on the lengths to which Stein went to plan the murder, and that but for Ramga's intervention and her assistance by the police, Stein would indeed have killed Mausolf. The trial court concluded that Stein was a "very dangerous" individual who showed no remorse.

**{¶ 57}** The trial court had discretion in deciding whether to impose a prison sentence and, if so, what sentence within the statutory range to impose. *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 100. We find no abuse of discretion in this case. Stein may only have planned to kill one person, Mausolf, but his criminal conduct traumatized his six-year-old son and Ramga, as well as Mausolf, thereby exacerbating the seriousness of his offense.

**{¶ 58}** Stein's Third Assignment of Error is overruled.

## VI.   Conclusion

{¶ 59}   All of Stein's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

DONOVAN and HALL, JJ., concur.


Copies mailed to:

Mathias H. Heck
Michele D. Phipps
Elizabeth C. Scott
Hon. Mary K. Huffman